THE STATE ex inf. CROW, Attorney-General, v. ARMOUR PACKING COMPANY, HAMMOND PACKING COMPANY, CUDAHY PACKING COMPANY, SWIFT & COMPANY, ARMOUR & COMPANY, and HENRY KRUG PACKING COMPANY.

In Banc, March 20, 1903.

1. **Conspiracy in Restraint of Trade:** PROOF: AGENCY: SOLICITORS: COMPETENCY. In a *quo warranto* proceeding to oust certain packing house companies from doing business in the State on the ground that they had formed a pool, trust and conspiracy to fix and maintain the price of dressed beef within the State, the evidence which went to establish the pool or trust consisted of the statements of managers of the "coolers," where the dressed beef carcasses were cooled and kept till sold, or of solicitors engaged in the business of soliciting orders from retail butchers, the butchers dealing exclusively with these agents. These statements related to the price at which sales could be made and the reasons for such prices, and to schemes and subterfuges for billing the goods at a price stated or as of certain quantities, and afterwards giving a rebate of the price or sending more meat than the bills called for, and were made by the solicitors or managers of the coolers when engaged in making sales or when allowing such rebates. They were statements of agents touching the business of the companies then being transacted by such agents, who were their only agents whom the buying public saw. *Held,* that such statements were

made by the authorized representatives of the companies, and were admissible in evidence against them for the purpose of establishing such pool or trust, and were just as competent as if they had been made by the highest officer of the company or had been solemnly adopted by the directors or stockholders and entered on the minutes of their meeting.

2. ——— : ——— : FACTS IN EVIDENCE. The testimony of nine butchers who did business with the five packing companies in a certain city showed that they all got rebates in money or pounds of beef, which in every instance were given by respondents' cooler managers or solicitors, who had exclusive charge of respondents' sales and who said they could not sell the meat for less than a certain price because all the companies had an agreement as to prices which were fixed every Wednesday; that these prices were given to such agents every Thursday, and if any such agent cut the price so given, his company would be fined and that, therefore, they circumvented their fellow-conspirators by giving rebates in prices and weights. The butchers further testified that they had tested these statements by going to the coolers of the respective respondents, and trying to buy their meats at prices cheaper than those made by the agents, but in every instance the prices were exactly as the several agents had stated them; that on various occasions a cooler manager or solicitor had ascertained that a purchaser had got a rebate from another company and he would immediately obtain from such purchaser the papers showing the rebate and take them away with him, and afterwards the agent of the company granting the rebate had complained that the purchaser had got him into trouble by permitting the facts to become known. That on various occasions these agents told the butchers they had better lay in a supply of meat before a certain day, as the prices would go up on that day, which they uniformly did at all the coolers. That in all coolers "concession" meat, or meat that had remained on hand so long that it had become discolored or moldy, was sold, but before it could be sold for less than the established price the managers of the other coolers were called in to examine it and if they believed it to be otherwise than first-class they "conceded" that it might be sold for a price less than the agreed price, and thereupon the manager sold it at the best price he could get. It further appeared that as soon as the ouster proceeding was begun all these arrangements and agreements stopped. Eleven butchers, former managers and inspectors of respondents' coolers in another large city, testified to the same effect. And as to dressed pork in that city, it was admitted by the agents of the five companies that they had an association for fixing and maintaining prices, whose members met once a week, hired a secretary at a salary, and fined each member of the combine for each violation of the prices agreed upon. *Held,* that these facts abundantly prove that the said respondents had formed a pool, trust and conspiracy to fix

and maintain the price of dressed beef within the State, under sections 8965, 8966, and 8971, Revised Statutes 1899, and authorize the court in ousting them from doing business within this State, or otherwise punishing them as the court may deem best for the public good.

·3.   ———: ———: ———: DEFENSES.   Nor is it any defense or bar to such action of ouster that respondents' business has greatly increased in late years, that they employ a large number of persons, that they pay large sums·in wages, that the cattle-raising business .has greatly increased since they began business, that such business would be injured if respondents were ousted from doing business in the State, that respondents regulate the prices of meat by the prices of cattle, and that much loss would result to resident companies if they were not allowed to operate their plants; nor is the fact that the butchers are as bad as respondents are, in that while they bought "concession" beef at reduced rates and were given rebates in order to draw their trade from other companies or to keep it, they did not sell "concession" meat any cheaper to the public, nor give the public any benefit of the rebates; nor is the fact that the butchers belonged to a union, which fixed the price of beef to consumers, and kept newcomers out of the field; nor is the fact that the combine in one of the cities was never lived up to, their members proving false to their trust agreement so often that they could not make the trust agreement effective.

4.   ———: THE EVILS OF A TRUST.   Pools, trusts and conspiracies to fix and maintain the prices of the necessaries of life, strike at the foundations of government; instill a destructive poison into the life of the body politic; wither the energies of competitors; blight individual investments in legitimate business; drive small and honest dealers out of business for themselves, and make them mere "hewers of wood and· drawers of water" for the trust; raise the cost of living and lower the price of wages; take from the average American freeman the ability to supply his family with necessary and wholesome food; force the boys away from school, and into the various branches of trade and labor, and the girls into workshops and other avenues of business and make them bread-winners while they are yet almost infants, because the head of the house can not earn enough to feed and clothe them.   The wisdom and experience of all ages and all peoples have demonstrated the necessity for laws against such combinations and for the rigid enforcement of them.

5.   ———: ———: PUBLIC POLICY: CONSTITUTIONALITY OF STATUTE.   The Missouri statutes against pools, trusts and combinations between independent dealers to fix and maintain the price of an article of prime necessity, are constitutional.   But such combinations are against public policy and void, as a matter of American common law, irrespective of whether there is any statute on the subject or not.

6. ———: COMPLETE MONOPOLY. In· order to be declared invalid as against public policy, or as in violation of the Missouri statutes, it is not essential that the combination constitute a complete monopoly in the things it sells.

7. ———: OUSTER: PUNISHMENT. The punishment to be imposed against corporations for entering into a pool, combination and trust, to fix and maintain prices of an article of prime necessity, rests in the sound discretion of the court. And the record showing that the respondents, immediately on the beginning of a quo warranto proceeding by the Attorney-General, abandoned their pool and trust organized for the purpose of fixing and maintaining the price of dressed beef, each is ordered to pay a fine of $5,000, and costs within thirty days, and failing to do so that the writ of ouster go.

## Quo Warranto.

WRIT OF OUSTER AWARDED CONDITIONALLY.

*Edward C. Crow,* Attorney-General, for informant.

The Missouri statute, article 1, chapter 143, Revised Statutes 1899, has been passed upon by this court and held valid and constitutional. State ex inf. Firemens' Fund Insurance Co., 152 Mo. 45. Such laws have been adjudged constitutional by the United States Supreme Court. United States v. Trans-Missouri Freight Association, 171 U. S. 558. The following State Supreme Courts have also held such laws constitutional: People v. Shealen, 139 N. Y. 251; Missouri River Coal Co., v. Barclay Coal Co., 68 Pa. St. 173; Central Ohio Salt Co. v. Guthrie, 35 Ohio St. 666; Anderson v. Jett, 89 Ky. 375; Chapin v. Brown, 83 Ia. 156; Craft v. McAnoughy, 79 Ill. 346; More v. Bennett, 140 Ill. 69; Milwaukee Masons and Builders Association v. Niezerounki, 95 Wis. 129; Vulcan Powder Co. v. Hercules Powder Co., 96 Cal. 150; Texas Standard Oil Co. v. Adowe, 83 Tex. 650; India Bagging Co. v. Kick & Co., 14 La. Ann. 168. The acts of the managers

and salesmen and agents of respondents bind the corporations. A corporation can only act through agents, and if the agents' acts or practices are in violation of law, the corporation must suffer the consequences. A corporation can and must control its agents and must see at its peril that its agents do not violate the law while attending to the business of the company. 152 Mo. 38. The Supreme Court of Missouri, as well as the courts of other States, hold that a corporation is liable for the acts of its agents, committed while in the prosecution of the company's business entrusted to their care, although the act is unknown to the president or board of directors of the corporation. 152 Mo. 381; 47 Mo. 442; 75 Mo. 325; 48 Mo. 152; 3 Mo. App. 442; 2 Mo. App. 540; 55 Mo. 214; 29 Mo. 38; 62 Mo. App. 119; Cooley on Torts (2 Ed.), 119, 120; 44 S. W. 936; 70 Mich. 485; 150 Mo. 113. The officer or agent of the corporation represents the corporation when he is acting within the scope of his duties, and his knowledge, while so engaged, with reference to matters pertaining to that branch of the business of the corporation, is the knowledge of the corporation. Elliott on Private Corporations, 247. The admissions and statements of an agent made while he is acting in the course of the performance of his duties as agent, with reference to any existing state of affairs of the business in which he is engaged, become a part of the *res gestae* and are clearly admissible against the principal. 48 Mo. 41. In this case, however, no effort has been made to show that the president and board of directors and the chief officers of the corporation did not have knowledge of the acts of their agents in fixing, maintaining and controlling the prices of the packers' products in this State. In the insurance cases, the officers of the companies were put upon the stand and they testified that the acts of the agents were without authority from

them and that they knew nothing of them, but the court held that as the company received the benefit of the acts of the agents and that as the agents were entrusted with the care and conduct of the business of the corporation in this state, their acts bound the corporation. In the case at bar, there is no such denial made by the president and board of directors of the corporation, and respondents stand silent in the face of the proof of the facts that their general managers and salesmen who were entrusted with the conduct of their business and the sale and disposition of their products direct to the butchers and the consuming public in this State, made and entered into a combination to fix, regulate, maintain and control the prices to be paid for dressed beef, pork and cured meats. The acts of agents of a corporation within the scope of their employment are the acts of the corporation, and are evidence against it. The Supreme Court of this State in 1871, in the case of Northrup v. Mississippi Valley Ins. Co., 47 Mo. 442, said: "A corporation acts through its officers; and the admissions of such officers made in the execution of the duties imposed upon them concerning matters in which they are called upon to act, and which matter is within the scope of the authority usually exercised by them, are evidence against the corporation." Pitts v. Steele Mercantile Company, 75 Mo. App. 232. Declarations and admissions of officers and agents of a corporation are admissible in evidence against the corporation for any purpose for which and under the same circumstances under which declarations and admissions of a natural person are admissible against him, although neither expressly authorized or ratified by the corporation, if they were made by an officer or agent in the course of a transaction on behalf of the corporation, and within the scope of his general power. 3 Clark & Marshall on Corporations, pp. 2216, 2217, 2218; Kirkstall Brew-

ery Co. v. Railroad, L. R. Q. B. 468; Railroad v. Pear-
son, 17 Court of App. 401; 70 Fed. 303; 115 Ala. 334;
106 Cal. 337; 6 Colo. 365; 18 Conn. 484; 70 Ga. 86; 103
Ga. 376; 134 Ill. 481; 153 Ind. 119; 77 N. W. (Ia.) 504;
59 Kans. 111; 175 Mass. 471; 113 Mich. 284; 51 N. H.
116; 15 N. J. Eq. 469; 55 N. J. L. 158; 157 N. Y. 694;
Steinback v. Ins. Co., 62 App. Div. (N. Y.) 133; 8 N.
D. 215; 11 Oh. St. 153; 179 Pa. St. 271; 50 S. Car. 25;
Ward v. Tenn. Coal Co., 57 S. W. 193; 91 Tex. 551;
23 Wash. 610; 11 W. Va. 94; 104 Wis. 173.   An ex-
press agreement to fix, regulate and control the
prices of the packers' product is proven in this case.
The proof of this express agreement as to the fresh
pork is competent evidence  against each of the  re-
spondents tending to prove the conspiracy between re-
spondents to fix, regulate and control the price to be
paid for dressed beef, because it proves an unlawful
agreement and relationship to exist between respon-
dents with reference to carrying on a portion of the
business that they all engaged in, to-wit, the pork bus-
iness. 38 Oh. St. 581; 46 Mich. 268; 2 Day(Conn.)205;
25 Conn. 486; 6 T. R. 527; 2 Esp. N. 719; 25 Ill. App.
350; 34 Ark. 649; 126 Ill. 150; 6 Am. and Eng. Ency.
of Law, pp. 864 and 865; 1 Cush. (Mass.) 189.   But
the State is not required to prove that the agreement
was made in express terms to fix and maintain the
prices of dressed beef.  State v. Walker, 98 Mo. 104;
United States v. Ringskoff, 6 Bissell (U. S.) 259; Uni-
ted States v. Goldberg, 7 Bissell (U. S.) 175; Drake
v. Stewart, 22 C. C. A. 104; Gardner v. Preston, 2 Day
(Conn.) 205; Speis v. People, 122 Ill. 213; Archer v.
State, 106 Ind. 426; Taylor County v. Standlee, 79 Ia.
666; Bloomer v. State, 48 Md. 521; Kelly v. People, 55
N. Y. 565.   Ordinarily conspiracies must be proved
by circumstantial evidence.  Bradford v. Sanner, 40
Pa. St. 9.   An agreement between conspirators may
be implied or expressed.   2 Fed. 754; 67 Fed. 698; 44
Fed. 896; 89 Ala. 121; Spies v. People, 122 Ill. 170; 6

Am. and Eng. Ency. of Law, 840. Where corporations receive the benefit of the acts of the agents and the fruits of the business transacted by them, the corporations are bound by the agents' acts. 44 S. W. 936; Elliott on Pri. Corp., sec. 247; 152 Mo. 37; 144 Mo. 420. It is not necessary to invoke the provisions of section 8971, Revised Statutes 1899, making acts of a foreign corporation prima facie proof of the act of the corporation, and the State invokes no prima facie presumptions under this statute, because agency of the managers and salesmen of respondents has been proven in this case just as it would be in any other where the question of the fact of agency is to be determined. If a conspiracy to fix, maintain, regulate and control the prices to be paid for dressed pork, beef and cured meats between respondents and others has been proven, then the acts and declarations of one of the respondents or its agents in the conduct of the business of respondent, is evidence against all of the respondents. 98 Mo. 104; 2 Pet. (U. S.) 359; 91 U. S. 426; 144 U. S. 263; 44 Fed. 896; 67 Fed. 698; 7 Wall. (U. S.) 132; 22 C. C. A. 104; 124 Mo. 1; 116 Mo. 605; Spies v. People, 3 Am. St. 320; 6 Am. and Eng. Enc. of Law (2 Ed.) 866, 870, 871; 7 Allen (Mass.) 541. This is the rule in civil as well as in criminal cases. 43 N. H. 36. The facts proven show a violation of the common law of Missouri by the respondents. Combinations and agreements which destroy or have a tendency to destroy competition in trade, by fixing, regulating and controlling the price of a commodity, are illegal at common law. 140 Ill. 80; 171 Ill. 484; 170 Ill. 551; 121 N. Y. 582. And if we had no antitrust statute in Missouri, the facts established in this case would make the respondents guilty of an unlawful combination and agreement at common law. 85 Fed. 282. Our Legislature has a right to declare, and has declared, that all corporations, foreign as well as domestic, violating our antitrust act, shall forfeit their right to do

business in Missouri.   100 Mass. 531; 10 Wal. 410; 28 Oh. St. 521; 6 Kans. 245; 152 Mo. 1.

*Karnes, New & Krauthoff,* and *Frank Hagerman* for respondents.

(1)   The report is founded upon hearsay and incompetent evidence.   Adams v. Railroad, 74 Mo. 513; 1 Greenl. Ev. (14 Ed.), sec. 114; 1 Am. and Eng. Ency. Law (2 Ed.), 695; Dorne v. Mfg. Co., 11 Cush. (Mass.) 205; Barber v. Bennett, 62 Vt. 50.   The *res gestae* was the sale to the butcher—not as to whether the principal was in some combination.   There was no pretense that the persons who made the statements had formed a combination, but the statement was that some one else higher in authority did so.   (2)   It is only fair to the commissioner to say that his idea must have been that the doctrine of the Insurance Cases, 152 Mo. 1, was that no corporation charged with a violation of the antitrust law could question the authority of any employee, and hence all statements of all employees could be shown.   Such a rule applies to no other kind of case and would make such a discrimination as would deprive respondents of the protection of the fourteenth amendment to the Federal Constitution.   The Insurance Cases teach no such doctrine, for the rule is as stated in 9 Am. and Eng. Ency. of Law (2 Ed.), 590.   Milwaukee Harv. Co. v. Tymich, 68 Ark. 225; s. c., 58 S. W. 252; Winchester, etc., Co. v. Creary, 116 U. S. 161; Railroad v. Arnett, 111 Fed. 854; Gembel v. Adams, 54 Iowa 389; s. c., 6 N. W. 582; Corbin v. Adams, 6 Cush. 93; Batchelder v. Emery, 20 N. H. 165.   (3)   The alleged high prices in beef at the time of filing of the information was because of the high price of the live animals.   The testimony on this subject is: The prices of the live animal controlled the price of the fresh meat.   When the price of the live animal went up the price of the fresh meat like-

wise increased. It so happened that in the spring of
1902 the prices were unusually large, based on the
short supply of cattle, and the high price of grain and
the drouth. The testimony of R. H. Allen is especi-
ally valuable in this connection and it finds strong sup-
port in the article of Fred C. Croxton, one of statisti-
cians of the United States Bureau of Statistics, enti-
tled: "The Advance in Beef Prices," found in the
January, 1903, number of the Review of Reviews (pp.
69-74.) Many of the State's witnesses expressly con-
ceded that the advance in price was only in accordance
with the advance in the price of the live animal.
(4) The Attorney-General is insistent upon a judg-
ment of ouster. A suspensive judgment of ouster was
entered in the Insurance Cases and without careful
thought a like judgment might be suggested in these
cases. Unlike the case of the Insurance Companies,
Swift & Company and Hammond Packing Company
have extensive packing house plants at St. Joseph, and
any kind of judgment of ouster would absolutely pre-
vent the use of the property if section 8972, of the Re-
vised Statutes 1899, be valid, or at least create such a
cloud on the title as to render difficult any future sale of
the property. (5) Even if a judgment of ouster should
go, it should be limited to ousting respondents from the
particular illegal act charged, i. e., from fixing or
maintaining prices to local butchers on the sale of fresh
meats from the coolers at St. Joseph and St. Louis.
The respondents have large and extensive packing
houses; they buy millions of dollars of live stock in
this State and ship their products to all portions of the
State. These acts are separate and distinct from the
mere sale of fresh meats to local butchers from local
coolers, which was an infinitesimal part of respon-
dents' business. Therefore, a judgment should go no
further than to declare "respondents are ousted from
the alleged right or privilege of being parties to any
combination to fix and maintain the prices on fresh

meats sold from the coolers at St. Joseph and St. Louis to the local butchers in those cities.'' Such is the extent of the offense or illegal right exercised. There is no doubt of the right to render a restricted judgment of ouster. This was decided in State ex inf. v. Lincoln Trust Co., 144 Mo. 599, where the court refused to enter a general ouster because of illegal acts but restricted the judgment to one of ouster against the particular illegal acts. So it has elsewhere been decided. State ex rel. v. Portland Natural Gas & Oil Co., 153 Ind. 483; s. c., 53 N. E. 1092; State ex rel. v. Railroad, 47 Oh. St. 130; s. c., 23 N. E. 928; State ex rel. v. Standard Oil Co., 49 Oh. St. 137; s. c., 30 N. E. 291. Such a course was pursued in Yore v. Superior Court, 108 Cal. 431; s. c., 41 Pac. 477; State v. Turnpike Co., 10 Conn. 167; State v. Topeka, 30 Kan. 653; s. c., 2 Pac. 592; State v. Regents, 55 Kan. 389; s. c., 40 Pac. 656; People v. Railroad, 15 Wend. (N. Y.) 113; Com. v. Canal Co., 43 Pa. St. 301. These cases only apply the well-settled rule that in quo warranto the character of judgment rests entirely within the discretion of the court. State v. Bernoudy, 36 Mo. 281; Weston v. Lane, 40 Kan. 479; s. c., 20 Pac. 260; 5 Thompson on Corporations, sec. 6812. So it was decided in State ex rel. v. Omaha & Council Bluffs Ry. & Bridge Co., 91 Iowa 517; s. c., 60 N. W. 126, a case against a foreign corporation failing to take out a license, and where the judgment was of ouster unless defendant should within sixty days qualify under the foreign corporation act. (6) No judgment of ouster should be entered. (a) A general judgment of ouster would be unequal and unfair to Swift & Company and Hammond Packing Company. These companies have large packing houses at St. Joseph. A general judgment of ouster prevents the future use of this property (R. S. 1899, sec. 8972) by respondents or their assigns. Nelson Morris & Company have a like plant at St. Joseph. It is a copartnership, and can not be ousted,

and yet it was found to be a party to the combination.
Hence, for the same offense, Swift and Hammond lose
their property and their right to do business, leaving
their rival with its property and master of the St. Jo-
seph business, and thus the court, by a stroke of the
pen, creates an absolute monopoly.  Armour Packing
Company and Cudahy Packing Company have plants
in Kansas City, almost adjoining the State line.  They
can cease doing business in this State but they still
have their packing houses and can continue to serve the
public elsewhere.  They are found to have been in the
same combination with Swift and Hammond, yet the
latter must close and lose their packing houses while
their lucky conspirators save theirs.  It is, therefore,
manifest that a general judgment of ouster would oper-
ate unequally, imposing upon those found equally
guilty unequal penalties.  (b)  The  following  are
other packers  dealing in fresh meats at St.  Joseph:
Morton Gregson & Company, of  Nebraska City, Ne-
braska; Wolff Packing Company, of Topeka, Kansas;
Thudium Company, of Leavenworth,  Kansas;  and
Morrell & Company, of Ottumwa, Iowa.   These pack-
ers sold at the same prices as respondents, including
the Krug Packing Company.  No effort was made to
charge or prove a case against any of them, though
manifestly, if there was a combination, they, in main-
taining the same prices, were privy to it.  (c)  The
beef packers in St. Louis are Armour Packing Com-
pany, Swift & Company, Nelson Morris & Company,
Cudahy Packing Company, St. Louis  Dressed  Beef
Company, Thomas Stringer, Missouri Packing Com-
pany, Union Stock Yards Company, Prendeville &
Brother, Steitz & Company, John Ball and William
Tamme, and the evidence is about as strong against some
of these packers as it is against any of the respondents,
including that objected to as hearsay.  No prosecu-
tion was instituted against any of them.  (d)  At the
St. Louis coolers the following are engaged in pork

packing and were in the alleged combination as to fresh pork: Philip Keim, Henry Sartorius, John H. Belz & Company, Louis Gruensfelder, Krey Packing Company, Wissmath & Sons, Charles Heil, D. W. Grant and Laux & Son. Of these Laux & Son, Krey Packing Company, Wissmath & Sons, Charles P. Heil and Louis Gruensfelder openly concede that they were in combination held to be unlawful. No effort is made to prosecute them, though confessedly guilty, and even if it be claimed that they turned State's evidence, and therefore are freed from punishment, it is enough not to punish any of these concerns, and the State ought not to reward them by ousting respondents so as to permit them to do all the business without competition. As to the Krug Packing Company, the report states that no effort was made to press the case against it. (e) At St. Joseph the butchers say that, although they got great concessions in prices, they never gave any benefit thereof to any customer. (f) These same butchers at St. Joseph, Missouri, were in a union or voluntary organization for the purpose of fixing and maintaining prices to the consumers of meat as harmful to the public as anything claimed against respondents.

MARSHALL, J.—This is a proceeding by quo warranto, instituted by the Attorney-General ex-officio, to oust the defendant corporations from their franchise to do business in this State, because of alleged violations by them of their powers and privileges.

The information charges that between August 22, 1899, and May 9, 1902, they "entered into an agreement, confederation, combination, pool and understanding among themselves, and with each other and Nelson Morris & Company, and Schwartzchild & Sulzberger, and other corporations and persons, to regulate, fix, and control the price to be paid by retail butchers and others for all dressed pork, beef and cured meats and

lard, slaughtered, manufactured and prepared and offered for sale or to be sold in the State of Missouri; and to maintain and control said prices for said products in this State when so regulated and fixed; and to prevent competition in said business in preparing, marketing and selling said products in this State between themselves and others engaged in like business; and that respondents and those others above named have maintained the said prices of dressed beef and pork and fresh meat, cured meat and lard so prepared, sold and offered for sale by them in this State, by and through their officers, managers, agents, salesmen, servants and employees acting for and in behalf of said corporations, and that by the acts and conduct of said corporations through their officers, salesmen, managers, agents, servants, and employees competition in the sale of dressed beef, dressed pork, fresh beef and cured meats of all kinds and lard in the markets of Missouri, has been unlawfully prevented and destroyed, to the great detriment of the public."

The information charges that "respondents and those who have combined with them, own, control and supply to the general public, ninety per cent of the dressed pork, beef and meats and all smoked and cured pork, beef and meats and lard and all fresh beef and pork and meats slaughtered, manufactured and cured and prepared and offered for sale or sold for general consumption in the State of Missouri, and that the object and purpose of said combination and agreement is to fix, regulate and maintain the price to be paid by the consuming public for said products above mentioned, and to control said price when so fixed, maintained and regulated and to destroy competition among themselves and others engaged in like business;" it is charged that "the officers, managers, agents, servants, and employees of the respondents, legally and fully authorized by each of the said several respondents to

Vol 173 mo—24

act for them and in their behalf in matters relating to
the sale and price to be charged for the products above
mentioned have since the 21st day of August, 1899,
met and continuously from time to time since said day
continued to meet, when they have deemed it neces-
sary, and unlawfully agreed and combined to fix and
maintain from week to week and day to day an agreed
price on the different grades, classes and kinds of
dressed beef, fresh beef, dressed pork, hams, bacon,
cured meats and lard, which should be sold or offered
for sale to the retail butchers and others and the con-
suming public in Missouri; that at said meetings the
officers, managers, employees, and agents of respond-
ents would and did agree upon and fix the price which
the respondent corporations through their officers,
agents and employees would sell in Missouri from week
to week and day to day, the products above mentioned
to the consuming public; that said meetings were held
by the said officers, agents and representatives of the
respondents for the purpose of fixing and maintaining
the agreed price to be charged in St. Louis, Kansas
City, St. Joseph and elsewhere in Missouri for the
products manufactured, prepared and sold by the re-
spondents; that at said meeting so held from time to
time as aforesaid, and for the purpose of controlling
and monopolizing the market and preventing compe-
tition in the sale of dressed meat, cured meat, pork and
lard, and in order that a common uniform price should
be charged the retail butchers and the consuming pub-
lic and all others in the State of Missouri by the agents
of all the respondents for the same or similar grades
of dressed beef, pork, cured meats and lard, the said
officers, managers and agents would agree upon the
prices at which all the different classes and kinds of
the products above mentioned should be sold in the
State of Missouri."

The information then charges that, "the said
prices which should be so charged in Missouri for the

said different commodities having been agreed upon as aforesaid at the said meetings, all the officers, managers, agents and servants of respondents charged and entrusted with the sale to butchers and others of said products throughout Missouri were notified of the prices agreed upon for the period of time during which it had been agreed said prices should be charged, and that the officers, managers, agents and employees of respondents entrusted and charged with the sale to retail butchers, meat dealers, and all others of said products in Missouri, were directed and required to sell said products for said period theretofore agreed upon at the prices fixed and not below the said prices agreed upon at said meeting so held as aforesaid." The information then alleges that "after the prices to be charged had been fixed and agreed upon as aforesaid, the said officers, managers, agents and employees of respondents did not sell and have not sold any of the kinds, classes, and grades of the products above mentioned, in this State to retail butchers, meat dealers and the consuming public, except at the prices fixed and agreed upon." It is then charged that "the agreement and combination so made in the manner as aforesaid, has prevented and does prevent competition in Missouri among respondents and others engaged in the same line or lines of business in this State, and that said acts of respondents have deprived and do deprive the public of free, full and wholesome competition in the sale of the commodities above mentioned, to the great damage and detriment of the public."

Informant then charges that "the general nature and object of the said combination, pool, agreement and confederation so made as aforesaid by the said respondent corporations by the means and in the manner aforesaid, are:

"First, to fix, regulate, maintain and control by the respondents the price and prices to be paid for all classes, kinds, brands and grades of dressed beef, dress-

ed pork, hams, bacon and all kinds of cured meats and lard, sold to the retail butchers and dealers in all kinds of fresh and cured meat and the consuming public in the cities of St. Joseph, Kansas City, St. Louis and throughout the State of Missouri.

"Second, to maintain the said price or prices when so fixed as aforesaid to be paid for all classes, kinds and brands of dressed beef, dressed pork, hams, bacon and all other cured meats and lard by the retail butchers, dealers in meat and the consuming public in the cities of St. Joseph, Kansas City, St. Louis and throughout the State of Missouri; and

"Third, that it is one of the objects of said combination, agreement, pool and confederation so made as aforesaid by the respondent corporations by the means and in the manner aforesaid to prevent, prohibit and avoid competition among themselves and others in the sale in Missouri of the said commodities dealt in and handled by the said respondents."

The information then charges that "the respondents by the means and manner aforesaid have obtained control of and monopolized to the exclusion of all others, the business of selling all classes and kinds and grades and brands of dressed beef, dressed pork, hams and bacon and cured meats and lard, to the retail butchers, dealers in meat and the consuming public in the State of Missouri to the great detriment of the public."

It is then charged that "by reason of the monopoly and control and exclusion of competition in the sale of said commodities aforesaid in the manner and means aforesaid, the respondents and their agents, officers and managers, have been enabled and now are selling to the butchers and dealers in meat and the consuming public in Missouri, certain grades of dressed beef, pork, hams, bacon, cured meats and lard of an unwholesome and inferior quality, to the great detriment of the public."

It is then charged that "the purpose and intention of respondents have been and now are to willfully and unlawfully combine and confederate as aforesaid, with each other, to monopolize and control absolutely and prevent competition in the business of dressed beef and meats as aforesaid in the State of Missouri, and that said respondents are now willfully and unlawfully maintaining said illegal agreement and unlawfully and illegally fixing and controlling prices in the manner aforesaid for said commodities, and which said price for the aforesaid commodities so fixed by the respondent and others acting with them as aforesaid is the minimum price to be charged by respondents throughout the State of Missouri for the different classes, kinds, grades and brands of dressed meat and pork, hams, bacon and cured meats and lard, and that said prices so fixed as aforesaid are the minimum prices at which agents, employees and officers of respondents are allowed to sell said products throughout Missouri."

It is then charged that "by reason of the premises and facts aforesaid since the 21st of August, 1899, and up to the present time, respondent corporations have grossly offended against the laws of this State and willfully and flagrantly and grossly abused and misused their corporate authority and franchises and privileges and have willfully and unlawfully assumed and willfully usurped authority and privileges not granted said corporations by the laws of Missouri by entering into and becoming a member of and a party to said trust, combination, confederation and pool as aforesaid, to monopolize and control the business of selling dressed beef, dressed pork, ham, bacon and all cured meats and lard in the State of Missouri and by means of said combination aforesaid to prevent competition in said business and to regulate, fix and maintain the price or prices to be charged retail butchers, dealers in meat and the consuming public for the aforesaid

products, and that in pursuance of the aforesaid agreement so made, respondents are now unlawfully and willfully monopolizing and regulating, fixing, maintaining and controlling the prices to be paid by retail butchers, dealers in meat and the consuming public for the products above mentioned, and that the action of the respondent corporations as hereinabove set out, is a willful and malicious perversion of the franchises granted to said corporations by the State of Missouri, and an illegal, willful usurpation of privileges not granted to them and is a great and permanent injury to the public."

The prayer of the petition is "that respondent corporations each and all of them severally be excluded from all corporate rights and franchises under the laws of the State, and that their rights, authority, license and certificate to do business under the laws of Missouri be declared forfeited, and that each of them and every one of them be ousted from their several franchises, corporate rights and privileges."

The Krug Packing Company answered separately, denying generally the allegations of the information.

The other respondents answered jointly, setting up many specific defenses. On motion of the Attorney-General the court struck out all of the defenses except the sixth paragraph of the second defense pleaded, which "first alleged the corporate organization of each of the above named Armour, Hammond and Cudahy and Swift packing companies as corporations and their right to do business in Missouri, and then respondents denied that they ever made or entered into an agreement, confederation, combination, pool or understanding, by and among either of them or any other person or corporation to regulate, fix and control the price to be paid by retail butchers or any one else for any kind of pork, beef, cured meats or lard, slaughtered or manufactured, prepared or offered for sale or to be sold in the State of Missouri and else-

where, or to maintain or control the prices thereof in this State or to prevent competition in business between respondents and others engaged in like business, nor did respondents ever take any part in maintaining any such agreement, combination, pool or understanding. That none of the officers, managers, agents, servants or employees of this respondent at any time with the consent of the respondent or otherwise agreed and combined to fix or maintain an agreed price of the products handled by respondents which should by respondents be sold or offered for sale to the retail butchers or others or to the consuming public in Missouri, and that respondents never did agree upon or fix the prices at which they would sell in Missouri such products. Respondents then denied generally each and every allegation in the information contained except as in this paragraph six of the second defense admitted. Respondents then denied that they ever agreed, entered into, or became a member of or a party to any pool, trust, agreement or understanding with any other person or persons or association of persons, to regulate and fix the price of any article or commodity whatsoever, or the price to be paid therefor; respondents then deny that they were ever parties to any contract, agreement or combination, designed or made with a view to lessen or which tended to lessen full and free competition in the importation, manufacture or sale of any article, product or commodity in this State. Respondents then also denied that they had ever sold to any one any kind of dressed beef, dressed pork, ham, bacon, cured meats and lard, which is or was unwholesome and of an inferior quality, and which was a detriment to the public.

It will be seen that this paragraph is in substance a general denial, and raised a general issue upon the pleadings.

All of the respondents, except the Krug Packing Company, which is a Missouri corporation, are corpo-

rations organized under the laws of sister States, and have complied with the laws of this State with respect to foreign corporations, and have been licensed to do business in this State. Armour & Company has never done any business in this State, and never was a member of any pool or guilty of any of the acts charged. The Krug Packing Company is not shown ever to have been guilty of the acts charged. This proceeding is therefore quashed as to them, and in speaking of the respondents hereinafter, reference is had only to the Armour Packing Company, the Hammond Packing Company, the Cudahy Packing Company and Swift & Company. Of these the Hammond Packing Company and Swift & Company have extensive packing plants at St. Joseph, Missouri. The Armour Packing Company and the Cudahy Packing Company have extensive plants in Kansas City, Kansas. Swift & Company, the Cudahy Company, the Armour Packing Company, have "coolers" in St. Joseph and St. Louis, and the Hammond Packing Company has a "cooler" in St. Joseph. The Armour Packing Company, the Cudahy Packing Company and Swift & Company, have no "coolers" in Kansas City, Missouri, but they sell their meats at their plants in Kansas City, Kansas, to the butchers and their customers in Kansas City, Missouri, and deliver them to said butchers and customers in Kansas City, Missouri.

Of the other corporations and persons alleged to have been with the respondents in the combination, Schwartzschild & Sulzberger Company had its plant in Kansas City, Kansas, and had "coolers" in Kansas City and St. Joseph, Missouri, and Nelson Morris & Company had their plant in East St. Louis, Illinois, and had "coolers" in St. Louis, Kansas City and St. Joseph.

The case was referred to Hon. I. H. Kinley, a member of the Kansas City bar, as special commissioner to take the testimony and make and report a

finding of the facts, and with leave to the parties to file exceptions thereto.

The report of the special commissioner covers twenty-five printed pages and is too voluminous to be embodied herein. In brief, he finds:

1. That the respondents, together with Nelson Morris & Company, between August 21, 1899, and May 9, 1902, entered into "agreements, confederations, combinations and understandings between themselves, to fix, regulate and control the prices of dressed beef, and fresh pork, slaughtered, manufactured, prepared and offered for sale, or to be sold by respondents to the retail butchers and others at St. Joseph, Missouri, and that respondents, with Nelson Morris & Company, agreed among themselves and with each other to maintain and control the prices of such dressed beef and fresh pork, and that in pursuance of said agreements to fix, maintain, and regulate the prices for which said dressed beef and fresh pork should be sold, said respondents above named, during said time between August 21, 1899, and May 9, 1902, have sold to the butchers at St. Joseph, Missouri, said dressed beef and fresh pork at the prices so fixed, regulated and maintained, except where such respondents gave rebates in money or in pounds of meat to their customers."

2. The commissioner makes a similar finding of fact as to dressed beef in St. Louis, except that he finds that the Hammond Packing Company did not do business in that city and was not in the combination, but that the St. Louis Dressed Beef Company was in the combination in that city with the respondents.

3. The commissioner finds that the respondents, and others, in St. Louis, "about 1899 or 1900, formed a voluntary association for the purpose of meeting once a week at some hotel or place designated and discussing and fixing the list prices to be charged the butchers for fresh pork, and at these meetings these representatives agreed among themselves and with

each other to maintain these prices as fixed under a penalty of paying a fine of five dollars for each sale under such fixed price. They employed a secretary at ten dollars per week, and paid the same by assessments on the members of the organization. These fines were expended for incidental expenses of the meetings and cigars. This organization, these meetings and agreements were testified to by several who were parties thereto and participated in the agreements and fixed prices for which each should sell fresh pork to the butchers in St. Louis, and that in pursuance of said combination, agreement and conspiracy said respondents maintained the prices so fixed in selling such fresh pork to the butchers at St. Louis, except where the prices were cut as aforesaid, and those testifying stated that they did not keep such agreements and did not intend to when they were made, and the most of the witnesses testified that the prices agreed on were reasonable.''

4. The commissioner finds that respondents at St. Joseph, St. Louis and Kansas City sell to the trade from sixty-five to eighty per cent of all the dressed beef and from fifty to sixty per cent of all the dressed pork that is handled in those cities, but that such sales amount to ''comparatively a very small portion of their business in selling fresh beef, fresh pork and provisions throughout this and foreign countries.''

5. The commissioner finds that as soon as the Attorney-General began the initiatory steps in this case all of the respondents abandoned all of the said combinations.

6. The commissioner finds that at St. Joseph and St. Louis, after meat had been in the coolers a certain length of time, the owers were allowed to sell it at a price less than the price fixed, and this is what is termed ''concession meat.''

7. The commissioner excluded evidence showing that if a butcher did not pay his bills to the respon-

dent with whom he dealt by Wednesday of each week, he was put on the C. O. D. list of all the respondents and persons in the combine, and that the members of the combine had a meeting every Wednesday night to hear such reports and make such order.

8. Over the objection of the Attorney-General the commissioner permitted the respondents to show how the cattle business in Kansas City had increased from $4,210,605 in 1890 to $1,655,966,699 in 1901, but afterwards excluded all except what related to the years 1899, 1900 and 1901. The commissioner also allowed the respondents to show the number of animals the respondents killed, the number of persons they employ, and the amount they pay for salaries and expenses. He refused to allow the respondents to show by various cattle-raisers that the cattle-raising business has become more profitable since the respondents have been engaged in business, and that it would be injured if the respondents were ousted from doing business in this State.

Both sides have filed voluminous exceptions to the findings of fact by the commissioner. The case has been argued orally at length and exhaustive briefs have been filed. The evidence has been printed in full, covering two volumes aggregating nine hundred and forty-nine pages, while the brief of the informant covers one hundred and six printed pages, and the two briefs of the respondents cover two hundred pages.

## I.

The statute of this State (R. S. 1899, sec. 8965), relating to "Pools, Trusts and Conspiracies," makes it unlawful for any persons, associations, partnerships, or corporations to become a member of or a party to "any pool, trust, agreement, combination, confederation, or understanding with any other corporation, partnership, individual or any other person or associ-

ation of persons, to regulate or fix the price of any article of manufacture, mechanism, merchandise, commodity, convenience, repair, any product of mining, or any article or thing whatsoever, or the price or premium to be paid for insuring property against loss or damage by fire, lightning, or storm, or to maintain said price when so regulated, or fixed," or to enter into any such pool to fix or limit the amount or quantity of any such articles. Section 8966 prohibits any combinations that are designed or tend "to lessen full and free competition in the importation, manufacture or sale of any article, product or commodity in this State." And section 8971 punishes the violation of the law by a forfeiture of the corporate rights and franchises, if it be a home corporation, or a forfeiture of its right to do business in this State if it be a foreign corporation. Other penalties and forfeitures are imposed by section 8968, but are not involved in nor sought to be enforced in this proceeding.

The commissioner reported that over the objections of the respondents he had admitted "the statements and admissions of the managers of these coolers and solicitors of respondents showing that such combinations and agreements to fix and regulate prices as aforesaid had been made and entered into by respondents; without such testimony it is doubtful if the existence of such combination could be found, but if such statements and admissions are admissible, as I have ruled them to be, then" he found that the respondents were guilty.

To appreciate the force of what is thus said it is necessary to understand how the respondents did business in this State. Great care has been taken to show that the business done by the respondents in this State is but an "infinitesimal" portion of the total business it does all over the world. The business done in this State is not done from the slaughtering or packing plants of the respondents, nor is it conducted or

personally managed by any of the higher officers or agents of the respondents, but it is all done through "coolers" and the agents of the respondents who manage the "coolers." and transact the business.

The commissioner finds the facts in this regard, and the conceded facts show the finding is correct, to be as follows: "A 'cooler' as shown by the testimony, consists of two or more rooms, at least one of which is refrigerated, the temperature being kept down from about thirty-four to forty degrees Fahrenheit; fresh meat is taken from the packing house and placed in this refrigerating room for sale to the butchers in the city where the cooler is located. As a rule the packers only sell to the butchers who sell to the public from their shops. At each cooler is a 'cooler manager' in charge thereof, one or more city solicitors, who solicit trade of the butchers, and a driver, who, from a wagon driven by him, delivers the meat to the butcher, who has purchased it. As a rule the butcher goes to the 'cooler,' inspects the carcass he wishes to buy, and if it suits him he purchases it and it is delivered to him at his shop, and he pays therefor at the cooler."

In other words, the purchasers deal exclusively with either the solicitors, who urge them to buy, or with the manager of the cooler. The drivers, of course, only deliver the goods. There is also a bookkeeper or cashier and an auditor at each cooler, who are subordinate to the manager, but in referring to the statements and admissions of the agents of the respondents these subordinate agents are not intended, but the managers of the coolers and the solicitors or salesmen are alone referred to.

The statements and admissions referred to, were made by the solicitors when engaged in the business of soliciting orders from the retail butchers, and related to the prices at which sales could be made and the reasons for such prices, and to schemes and subterfuges for billing the goods at a price stated or as of certain

quantities and afterwards giving a rebate of the price or for sending more meat than the bills called for—or, as it is termed by the witnesses, of allowing a rebate in cash or in pounds of meat—or they were made by the managers of the coolers when engaged in making sales or when allowing such rebates. They were, therefore, statements made by these persons who were employed by the respondents, and who transacted all the respondents' business of selling in this State, were made while so engaged, and related to the business being transacted. They, were, therefore, statements of agents touching the business of the principal then being transacted by such agents, and such agents were the only representatives of the respondents that the buying public ever saw or dealt with. They quoted the prices to the public. They made and carried out the arrangements for rebates. They delivered the goods and collected the bills. They were, therefore, statements made by the authorized representatives of the respondents, while in the transaction of their business and touching the business. They were, therefore, admissible in evidence and were just as binding upon the respondents as if those statements had been made by the highest officer of the company or had been solemnly adopted by the directors or stockholders of the company and entered on the minutes of their meeting. [Northrup v. Ins. Co., 47 Mo. 442; Benevolent Assn. v. Kribben, 48 Mo. l. c. 41; Adams v. Railroad, 74 Mo. 553; Boogher v. Life Association of America, 75 Mo. l. c. 324; State ex inf. v. Ins. Co., 150 Mo. l. c. 133, 134; Nickell v. Ins. Co., 144 Mo. 420; State ex inf. v. Ins. Co., 152 Mo. l. c. 38.]

The testimony introduced by the State was abundant to show that the respondents were members of a combination or pool to fix and maintain prices. The State called as witnesses nine butchers who did business with the respondents in St. Joseph whose testimony showed that they all got rebates in money or pounds

of meat from the respondents, and that in every instance they were given by the solicitors or cooler managers, who said they could not sell the meat for less than a certain price because all of the respondents had an agreement as to prices which was fixed every Wednesday by the head men of the packing plants, and the prices—given by them to the cooler managers on Thursday—by the cooler managers and solicitors were given to the trade, and that if any one cut the price he would be fined, so they circumvented their fellow-conspirators by giving rebates as herein described. That such a combination existed at the time charged in this case is further shown by the facts and circumstances outside of any admissions and statements of the agents of the respondents.   The witnesses testified that they had tested the various respondents by going to the several coolers, of the different respondents, on the same day, and trying to buy cheaper from one than was offered them by another, and in every instance they found the prices to be exactly the same at all of the coolers.  It further appeared that on various occasions a manager or solicitor ascertained that a purchaser had gotten a rebate from one of the other companies, and he would immediately secure from the customer the papers showing the rebate and take them away with him, and afterwards the agent of the company that had granted the rebate complained that the purchaser had gotten him into trouble by allowing the fact to become known.  In fact, it appears that in every instance when a rebate was granted, secrecy was strictly enjoined upon the customer.  It further appeared that on various occasions the cooler managers or solicitors would tell the butchers they had better lay in a supply of meat before a certain day, as the prices would go up on that day, and that in every instance the prices did go up uniformly at the time specified, at all the coolers of all the respondents. It further appeared that at all of the coolers "concession meat,"

as it is called, was sold. By "concession meat" is meant meat that has remained so long on hand in the cooler that it has become discolored or mouldy or not exactly what would be termed as first-class, but as some of the witnesses call it, unfit for sale, but not exactly unfit for use after it had been trimmed up. When any cooler had such meat on hand, the manager of another or of other coolers would be called in and they would examine it and if they believed it to be of such a character, they would "concede" to the manager of the cooler having such meat, the right or privilege to sell it for a price less than the agreed price. The manager who had obtained such concession would then sell it or try to sell it to the trade, at such price as he could get for it.

It further appeared that no butcher could buy meat from any packer that did not do business in St. Joseph, because packers located elsewhere refused to sell to them, stating as a reason that St. Joseph was the respondents' territory and such outside packers were afraid to invade their territory.

It further appeared that when the Attorney-General took the initiatory steps in this case, the respondents immediately dissolved, discontinued and stopped the pool and combination arrangements.

The State called eleven witnesses in St. Louis, butchers, city meat inspectors and former managers of the respondents' coolers, who testified to the same facts, circumstances and conditions in St. Louis, as to dressed beef in St. Louis. As to dressed pork the State called five witnesses, who were themselves members of such a pool, trust or combination, who testified that the respondents (except the Hammond Packing Company) were also members of the pool; that the representatives of the pool, trust or combination met every week at either the Southern or Lindell Hotels; that the prices were fixed by an arbitrator named Mc-Call, who was paid a salary of ten dollars a week,

raised by assessments on all of the members, and if any one cut the prices he was fined five dollars; that the combination ran for two or three years and until the institution of this suit, when it was abandoned. As to the existence of a combination as to dressed pork, therefore, the facts and circumstances show it as plainly as they do in regard to dressed beef, and in addition, five of the conspirators testified directly to it.

It is quite too plain for doubt that persons or companies who are engaged in the same line of business, in the same place, do not bill goods at one price and give rebates in money or goods or weights, and do not give notice of an uniform advance of rates at a certain date, always followed by such a rise, and do not maintain an uniform selling price, and do not call in their competitors and get them to "concede" to them a right to sell shopworn or old goods at a price less than such uniform price, and do not gather up papers or bills of their competitors showing that they have been selling below a certain price, and do not abandon, dissolve and discontinue their understandings or combinations as soon as the legality thereof is called in question by the State's officers, unless there has been an unlawful pool, trust or combination to fix and maintain prices. Such acts and circumstances and practices speak as loudly, as directly and as certainly, and tell as strong and conclusive a tale of wrongdoing in those regards as any witness could possibly testify to it or any resolution formally adopted by the directors or stockholders could prove it.

Independent, therefore, of any admissions or statements of the managers of the coolers or of the solicitors, which, however, were clearly admissible, the State has made out a case against the respondents under the facts and circumstances of the case. The commissioner, therefore, reached the right conclusion, and properly followed the rules of law as to the ad-

Vol 173 mo—25

missions and statements of the managers of the coolers and solicitors, as laid down in the cases hereinbefore cited, but he was in error in saying that outside of such admissions and statements it is doubtful if the charges against the respondents could be sustained.

As against all such direct testimony, admissions and statements the respondents offer no proofs, call no witnesses, and remain absolutely mute. They do not even do, as was done in State ex inf. Atty.-Genl. v. Ins. Co., 152 Mo. 1, call the chief officers of the conspirators and show that they never knew of nor authorized any such arrangements or combinations by their agents. They do not show or pretend that they have not reaped the benefits of such arrangements or combinations for all the years they existed. They simply let the State's showing stand uncontradicted, and content themselves with claiming that the admissions and statements were not made at the time the agents were engaged in transacting the business they were given power to transact, but were made before or after the said time, which an analysis of the evidence shows is not the fact, and with further showing how their business has increased in the last ten years, how many persons they employ, how much wages they pay, how the cattle-raising business has increased since they began business, and how it would be injured if they are ousted of their right to do business in this State, how they regulate their prices by the price of cattle, how much loss the resident companies would suffer by reason of not being allowed to operate their plants, how the butchers in St. Joseph are as bad as they are, and worse, because while they sell concession beef to the butchers at reduced prices, and give butchers rebates to get their trade from each other or to retain their trade, the butchers do not sell concession meat any cheaper to the public, nor do they give the public the benefit of any rebates, and that the butchers belong to a union, which fixes the price of meat for

the consumers and keeps newcomers out of the trade, and prohibits or tries to prohibit the packers from selling directly to the trade, and that as to the dressed pork combine in St. Louis, it was never lived up to, and never was intended to be lived up to, and the members were false to their trust agreements so often that they could not make the combination effective.

None of these matters constitute any defense or bar to this action. The commissioner admitted the testimony bearing on most of these matters for the purpose of enabling the court to be fully advised as to all the conditions when it came to fixing the punishment to be imposed.

"Competition is the life of trade." Pools, trusts and conspiracies to fix or maintain the prices of the necessaries of life, strike at the foundation of government; instill a destructive poison into the life of the body politic; wither the energies of competitors, blight individual investments in legitimate business; drive small and honest dealers out of business for themselves, and make them mere "hewers of wood and drawers of water" for the trust; raise the cost of living and lower the price of wages; take from the average American freeman the ability to supply his family with necessary, adequate and wholesome food; force the boys away from school, and into the various branches of trade and labor, and the girls into workshops and other avenues of business, and make them breadwinners while they are yet almost infants, because the head of the house can not earn enough to feed and clothe his family.

The people are helpless to protect themselves. The powers that be must protect them, or as surely as history records the story of republican government in Rome, so surely will the foundations of our government be shaken and its perpetuity threatened. Missouri (State ex inf. Atty.-General v. Insurance Co., 152 Mo. 1); New York (People v. Sheldon, 139 N. Y.

251); Pennsylvania (Coal Co. v. Coal Co., 68 Pa. St. 173); Ohio (Salt Co. v. Guthrie, 35 Ohio St. 666); Kentucky (Anderson v. Jett, 89 Ky. 375); Iowa (Chapin v. Brown, 83 Iowa 156); Illinois (Craft v. McConoughy, 79 Ills. 346, and More v. Bennett, 140 Ills. 69); Wisconsin (Builders' Assn. v. Niezerowski, 95 Wis. 129); California (Vulcan Powder Co. v. Powder Co., 96 Cal. 510); Texas (Texas Standard Oil Co. v. Adoue, 83 Tex. 650); Louisiana (India Bagging Co. v. Kock, 14 La. Ann. 168), and the Supreme Court of the United States (U. S. v. Trans-Missouri Freight Association, 171 U. S. l. c. 558) have held statutes which prohibited such combinations or trusts to be constitutional, and further, that all such combinations or agreements are against public policy and void at common law, and as a matter of American common law, irrespective of whether there is any statute on the subject or not.

The rule is well stated in the syllabus to People v. Sheldon, 139 N. Y. 251: "A combination between independent dealers to prevent competition between themselves in the sale of an article of prime necessity [the combination was to fix and maintain the price of coal] is, in the contemplation of law, an act inimical to trade or commerce, without regard to what may be done under and in pursuance of it, and although the object of such a combination was merely the due protection of the parties against ruinous rivalry, and no attempt was made to charge undue or excessive prices; where it appears that the parties acted under the agreement, an indictment for conspiracy is sustainable."

The court further aptly says:

"But the question here does not, we think, turn on the point whether the agreement between the retail dealers in coal did, as matter of fact, result in injury to the public or to the community in Lockport. The question is, was the agreement, in view of what might have been done under it and the fact that it was an agreement the effect of which was to prevent compe-

tition among the coal dealers, one upon which the law affixes the brand of condemnation. It has hitherto been an accepted maxim in political economy that 'competition is the life of trade.' The courts have acted upon and adopted this maxim in passing upon the validity of agreements, the design of which was to prevent competition in trade, and have held such agreements to be invalid. It is to be noticed that the organization of the 'exchange' was of the most formal character. The articles bound all who became members to conform to the regulations. The observance of such regulations by the members was enforced by penalties and forfeitures. A member accused by the secretary of having violated any provision of the constitution or by-laws was required to purge himself by affidavit, although evidence to sustain the charge should be lacking. The shippers of coal were to be notified in case of persistent default by the member that 'he is not entitled to the privileges of membership in the exchange.' No member was permitted to sell coal at less than the price fixed by the exchange. The organization was a carefully devised scheme to prevent competition in the price of coal among the retail dealers, and the moral and material power of the combination afforded a reasonable guaranty that others would not engage in the business in Lockport except in conformity with the rules of the exchange.

"The cases of Hooker v. Vandewater (4 Den. 349), and Stanton v. Allen (5 Id. 434) are, we think, decisive authorities in support of the judgment in this case. They were cases of combinations between transportation lines on the canals, to maintain rates for the carriage of goods and passengers, and the court, in those cases, held that the agreements were void, on the ground that they were agreements to prevent competition, and the doctrine was affirmed that agreements having that purpose, made between independent lines of transportation, were, in law, agreements injurious

to trade.   In those cases it was not shown that the rates fixed were excessive.   In the case in 5th Denio, the judge delivering the opinion referred to the effect of the agreement upon the public revenue from the canals. This was an added circumstance, tending to show the injury which might result from agreements to raise prices or prevent competition.  [See, also, People v. Fisher, 14 Wend. 10; Arnot v. P. & E. Coal Co., 68 N. Y. 558.]  The gravamen of the offense of conspiracy is the combination.   Agreements to prevent competition in trade are, in contemplation of law, injurious to trade, because they are liable to be injuriously used.   The present case may be used as an illustration.   The price of coal now fixed by the exchange may be reasonable in view of the interests both of dealers and consumers, but the organization may not always be guided by the principle of absolute justice.   There are some limitations in the constitution of the exchange, but these may be changed and the price of coal may be unreasonably advanced.   It is manifest that the exchange is acting in sympathy with the producers and shippers of coal. Some of the shippers were present when the plan of organization was considered, and it was indicated on the trial that the producers had a similar organization between themselves.   If agreements and combinations to prevent competition in prices are or may be hurtful to trade, the only sure remedy is to prohibit all agreements of that character.  If the validity of such an agreement was made to depend upon actual proof of public prejudice or injury, it would be very difficult in any case to establish the invalidity, although the moral evidence might be very convincing.   We are of opinion that the principle upon which the case was submitted to the jury, is sanctioned by the decisions in this State, and that the jury were properly instructed that if the purpose of the agreement was to prevent competition in the price of coal between the retail dealers, it was illegal and justified the conviction of the defendants.''

In People v. North River Sugar Refining Co., 121 N. Y. 582, it was held, as stated in syllabus, that "as corporate grants are always assumed to have been made for the public benefit, any conduct which destroys their functions, maims and cripples their separate activity, and takes away free and independent action, affects unfavorably the public interests." Accordingly where a number of persons, including the defendant in that case, entered into an agreement, the purposes of which were declared to be, "1. To promote economy of administration and to reduce the cost of refining, thus enabling the price of sugar to be kept as low as is consistent with reasonable profit. 2. To give to each refinery the benefit of all appliances and processes known or used by the others, and useful to improve the quality and diminish the cost of refined sugar. 3. To furnish protection against unlawful combinations of labor. 4. To protect against inducements to lower the standard of refined sugar. 5. Generally to promote the interests of the parties hereto in all lawful and suitable ways," and each of the parties transferred all its shares of stock to a board and the board managed the whole business, it was held to be against public policy, in restraint of trade and void.

It is not essential that the combination or trust shall constitute a complete monopoly. For as was said by Mr. Chief Justice Fuller, in United States v. Knight, 156 U. S. l. c. 16: "Again, all the the authorities agree that in order to vitiate a contract or combination it is not essential that its result shall be a complete monopoly; it is sufficient if it really tends to that end and to deprive the public of the advantages which flow from free competition."

As was well said by Best, C. J., in Homer v. Ashford, 3 Bing. 326: "The law will not permit any one to restrain a person from doing what his own interests and the public welfare require he should do."

If it be true that a combination or trust among the respondents has increased the cattle business in this State and has encouraged the stock-raising business and its prohibition hereafter will injure or destroy such business, or if such trust arrangements have given employment to so many people and put in circulation so many millions of dollars of money in this State, or if it be that the home corporations would lose their plants entirely if their franchises were taken away from them, such considerations would not amount to a defense, or excuse for the offense charged. They are matters that should have been thought of before the offense was committed. So long as the law puts the stamp of condemnation ·on all arrangements, agreements, pools, trusts and conspiracies to fix and maintain the prices of articles of prime necessity, the courts have no option but to enforce the law.

The wisdom and experience of all ages and all people have demonstrated the necessity for such laws, and for the rigid enforcement of them. And even after so many years of unfailing enforcement of such laws, the terrors and consequences thereof have not been sufficient to deter people from violating them.

The conclusion is irresistible that the defendants are guilty of being members of a trust, pool or conspiracy to fix and maintain the prices of dressed beef and dressed pork in this State at the times charged in the petition, except as before stated, Armour & Company, and the Henry Krug Packing Company, as to whom the writ must be quashed.

## II.

This leaves only the question of punishment. The punishment to be imposed rests in the sound judicial discretion of the court. It need not necessarily be a general judgment of ouster. It may be an ouster of the right to do the particular act complained of (State

ex inf. v. Lincoln Trust Co., 144 Mo. 562; State ex rel. v. Gas & Oil Co., 153 Ind. 483; State ex rel. v. Railroad, 47 Ohio St. 130; State ex rel v. Standard Oil Co., 49 Ohio St. 137; Yore v. Superior Court, 108 Cal. 431; State v. Turnpike Co., 10 Conn. 167; State ex rel. v. Topeka, 30 Kas. 653; People v. Railroad, 15 Wend. 113; Commonwealth v. Canal Co., 43 Pa. St. 301); or it may be a suspensive judgment of ouster with a fine accompaniment (State ex inf. v. Ins. Co., 152 Mo. 1), or it may be a simple fine if it appears that the trust, pool or conspiracy complained of and proved, has been abandoned.   In short, the character of the judgment rests in the discretion of the court.   [5 Thompson on Corp., sec. 6812; Westin v. Lane, 40 Kan. 479; State ex rel. v. Railroad, 91 Iowa 517; State ex inf. v. Bernoudy, 36 Mo. l. c. 281.]

Under all the circumstances, a judgment of absolute ouster is not necessary, but the ends of justice will be satisfied by the imposition of a fine, and the payment of all the costs in the case.   It is accordingly ordered that the respondents, the Armour Packing Company, the Hammond Packing Company, the Cudahy Packing Company and Swift & Company, each pay to the clerk of this court within thirty days from this date, the sum of five thousand dollars as a fine, and that they also pay the costs in this case.   And it is further ordered that if the respondents or any of them fail to pay said fine, and costs, within said time then they or those so failing be ousted of all rights, privileges and franchises of every nature and kind, conferred upon them by the laws of this State, and be forever prohibited from doing business in this State.

All concur.