ATTORNEY GENERAL, *ex rel.* JAMES, *v.* NATIONAL CASH
REGISTER CO.

1. CORPORATIONS—RIGHT TO DO BUSINESS—QUO WARRANTO—MONOP-
   OLIES—ANTI TRUST ACT.

   Evidence tending to show that respondent corporation used
   unlawful means in competing with its business rivals; that
   it interfered with their contracts and salesmen; that it
   circulated damaging statements relating to their credit
   and standing; that it employed spies, and instituted numer-
   ous suits for infringement of patents without intending to
   prosecute them to a final conclusion, etc., reviewed, and
   *held,* to establish the averments of relator's petition in
   quo warranto, charging that respondent exercised a monop-
   oly in the business of manufacturing and selling cash reg-
   isters, and *held,* that the intent to create a monopoly was
   shown to exist. Act No. 329, Pub. Acts 1905 (2 How. Stat.
   [2d Ed.] § 2945).

2. SAME—DEFINITION—TRUSTS AND MONOPOLIES.

   A monopoly, in the modern sense, is created when, as a re-
   sult of efforts to that end, previously competing businesses
   are so concentrated in the hands of a single person or cor-
   poration, or a few persons or corporations acting together,
   as that they have the power to practically control prices
   of commodities and thus suppress competition.

3. SAME—EVIDENCE—UNFAIR COMPETITION.

   It is sufficient if the relator shows that the incorporators
   of the respondent acted together to establish a monopoly
   in pursuance of a common object; an agreement or contract
   to work together need not be proved.

4. SAME—EVIDENCE—CONSPIRACY.

   Where the effect of the testimony offered was to establish
   that successive corporations had been formed under the
   laws of different States and had carried out or furthered
   the creation of a monopoly with the co-operation of the
   principal stockholders, that the same parties had been in-
   terested in the various companies that had been formed,
   and the existing company had substantially the same offi-
   cers and stockholders as the first organization, evidence

was admissible to show the wrongful acts and purpose of the corporations existing prior to the organization of respondent and might properly be considered as explaining and characterizing the acts of respondent.

5. SAME—PRINCIPAL AND AGENT—ADMISSIONS AND ACTS OF AGENTS.
Acts and conduct of officers and agents of the respondent were admissible in evidence to show the purpose to create a monopoly: and specific transactions and admissions of agents and sales managers done in furtherance of their employment were valid proof of the illegal intent, although a part thereof took place a number of years prior to the admission of the present corporation to transact business in Michigan.

6. SAME—CONTRACTS—WRONGFUL INTERFERENCE.
There are two ways, at least, of interfering illegally with contracts of other persons, *first*, by preventing the making of such contracts; *second*, by causing them to be broken after they are made.

7. SAME—BREACH OF CONTRACT—ACTIONS.
To establish a right of action for procuring a party not to enter into contract relations, it is essential to prove: (1) notice to the defendant of the relation existing between the parties to the proposed contract; (2) interference with that relation, and (3) damages resulting from this interference.

8. SAME—MISUSE OF COURTS AND PROCESS.
While it is lawful and proper for the owner of a patent to give notice of infringement to any person using an infringing article and it is permissible to prosecute a suit against the infringer or user, or to bring an action for damages, the proceedings must be instituted in good faith and not to annoy or intimidate or drive out of business a competitor.

9. SAME—UNFAIR COMPETITION—EXCUSE.
As an excuse for resorting to unfair means of competition it was not sufficient that competitors of the respondent also employed similar measures, or that their acts were unlawful.

10. SAME—MONOPOLIES—PUNISHMENT—FINE.
The punishment to be imposed under the statute (3 Comp. Laws, § 9961; 5 How. Stat. [2d Ed.] § 14076), rests in the sound discretion of the court whether a judgment of ouster

should be entered or a fine imposed; and *held*, under the evidence, that a fine of $10,000 should be assessed against respondent.

Information in the nature of quo warranto by John E. Bird, Attorney General of the State of Michigan, on the relation of Henry F. James, against the National Cash Register Company, a foreign corporation, to terminate the right of respondent to engage in business in the State of Michigan on the ground that it is exercising a monopoly. Submitted February 2, 1914. (Docket No. 25.) Decided July 25, 1914.

*Grant Fellows,* Attorney General, and *Samuel D. Pepper,* Assistant Attorney General (*Henry E. Chase,* of counsel), for relator.

*William L. Carpenter* and *John F. Wilson* (*Lawrence Maxwell,* of counsel), for respondent.

STONE, J. This is an information in the nature of a quo warranto on behalf of the people of this State, on relation of Henry F. James, filed in this court on July 14, 1909, in and by which the court was informed that the National Cash Register Company, an Ohio corporation, admitted to do business in Michigan, had been for the year last past, and then was, violating the anti-trust laws of Michigan in establishing and maintaining a monopoly of the business of manufacturing, buying, selling, and dealing in cash registers, and conspiring with its officers, directors, stockholders, agents, and others to create and maintain a monopoly, and to suppress all competition, and to control the manufacture and sale of cash registers; it is alleged to that end it has carried on a war of extermination against all competing manufacturers, dealers, and agents until it has very little competition, and has practically a monopoly of the business, manufacturing and selling 95 per cent. of all the cash registers made

and sold in the world, its intention, purpose, policy, and object being to eliminate all competition, present and future, and to be the only manufacturer and seller of cash register machines in the world; and it is alleged that in the carrying out of such intention, purpose, policy, and object it has used, among others, the following methods: Interference with competing companies; interference with competing salesmen; interference with sales made by competing salesmen, and interfering with the contracts of competing companies; following and interfering with the business of competing salesmen; interfering with the mechanism of competing machines; watching and spying out the shipments of competing companies; watching the factories of competing manufacturers; circulating damaging statements relating to the standing and business of competing companies; maintaining a display window of competitive machines, and advertising to sell them at 30 cents on the dollar; manufacturing and using knockout machines; employing secret agents, detectives, spies and knockout men; the use of knockout credit cards; placing its employees in offices of competing companies without the latters' knowledge; blocking sales of competitors; instituting many suits and threatening to bring others against manufacturers and competing companies, and against their customers; bringing infringement suits without intention of prosecuting them; and, in many other ways too numerous to mention, endeavoring to establish a monopoly in the business. Attached to the brief of the attorney general is a list of competing companies which it is claimed have been put out of business by the respondent.

The pleadings are too lengthy to be set forth in detail. It may be sufficient to say that, some question having been raised as to the prolixity of the replication, the following order was entered in this court in

pursuance of a stipulation. The order reads, in substance, as follows:

"On reading and filing the stipulation of the parties to the above entitled cause, by the respective counsels, and in pursuance thereof, it is ordered that the following are the controverted issues of fact to be determined in this cause:

"(1) Was the respondent organized and incorporated under the laws of the State of New Jersey and later under the laws of the State of Ohio?

"(2) Was the respondent organized for the purpose and with the intent of establishing and maintaining an unlawful monopoly of the business of manufacturing, buying, selling, and dealing in cash registers in the United States?

"(3) Did respondent file its articles of association and certificate with the secretary of State of the State of Michigan and pay the fee required by statute to be paid by foreign corporations desiring to do business in Michigan, with the intent and purpose of establishing and maintaining an unlawful monopoly of the business of manufacturing, buying, selling, and dealing in cash registers in the United States?

"(4) Has respondent done business in Michigan and exercised the rights, privileges, and franchises of a corporation within the State of Michigan with or in pursuance of any purpose or intent to establish and maintain an unlawful monopoly of the business of manufacturing, buying, selling, and dealing in cash registers in the United States, and, if so, during what time?

"(5) Since filing the articles of association in the State of Michigan, has much of the business transacted by the respondent in the State of Michigan been commerce among the several States of the United States within the meaning and intent of section 8, article 1, of the Constitution of the United States?

"It is further ordered that neither party shall, by reason of the making of the stipulation, as to the issues in said cause, waive the right to insist upon a judgment in his or its favor, notwithstanding the finding upon any or all of the issues herein settled.

"It is further ordered that the motion for reformation of the replication heretofore filed by the respond-

ent in this cause be, and is hereby, dismissed without cost to either party."

Without referring to all the legislation upon the subject, it may be well to insert here section 4 of Act No. 329 of the Public Acts of 1905 (2 How. Stat. [2d Ed.] § 2942 *et seq.*) ; that section reads as follows:

"Any foreign corporation organized for the purpose and with the intent of establishing and maintaining or of attempting to establish and maintain a monopoly of any trade, pursuit, avocation, profession or business, is hereby prohibited from doing business in this State, and any permission or authority heretofore obtained by any such corporation to do business in this State is hereby declared to be illegal and void."

The history of the National Cash Register Company and its predecessors is substantially as follows:

John H. Patterson and Frank J. Patterson, brothers, coal mine owners and dealers in the State of Ohio, purchased, in the year 1882, for $6,500, an interest in the National Manufacturing Company, an Ohio corporation, manufacturing cash register machines at Dayton, Ohio. In the year 1884 the name National Manufacturing Company was changed to National Cash Register Company, and John H. Patterson and Frank J. Patterson became majority stockholders. In the year 1886 the company was reorganized and John H. Patterson and Frank J. Patterson acquired the entire capital stock and became sole owners of the National Cash Register Company. On the 27th day of March, 1899, the National Cash Register Company was incorporated under the laws of the State of New Jersey, and ceased to do business as an Ohio corporation. On the 19th day of March, 1906, the National Cash Register Company was incorporated under the laws of the State of Ohio and ceased to be a New Jersey corporation, and has since such time been an Ohio corporation. On the 11th

day of July, 1906, the National Cash Register Company complied with the requirements of Act No. 206 of the Public Acts of 1901, and was admitted to do business in Michigan. John H. Patterson has been president and majority stockholder of the National Cash Register Company since 1886, and has controlled, directed, and dictated its policy of business regardless of any and all changes in its corporate life or affairs. It has grown from a $10,000 to a $10,-000,000 corporation, manufacturing 400 cash registers a day, more than 250 kinds of machines, employing from 4,500 to 5,000 persons in its factory and 1,800 to 2,000 persons outside the factory, with agencies in nearly all the countries in the world. In the guides manual, a handbook of information published by the National Cash Register Company, in September, 1905, is found the following statement:

"We not only show the different improvements in the National, but also the different registers manufactured by our former competitors. Two hundred of these concerns have started in the cash register business. All but two have gone out of business. They have wasted amounts ranging from $5,000 to $500,000 cash each; in all, more than five million dollars."

On June 12, 1912, by agreement of counsel, the following statement was made on the record by counsel for respondent in response to a request which counsel for the prosecution had made:

"During the period from 1884 to date, 404 United States patents issued to the National Cash Register Company on its inventions, 210 were purchased from manufacturers, 218 purchased from individuals, 50 doubtful whether they were the invention of the company's inventors or whether they were acquired from outside individuals, and two were acquired on a royalty basis. The National Company has now about 200 applications pending in the United States Patent Office. Of the 218 just listed as purchased from in-

dividuals, this includes about 70 which it is doubtful whether they should be classed as manufacturers or individuals, for the reason that there were groups of patents acquired from individuals organized under a company name, but there is no way of telling from company records whether they ever did any manufacturing at the time of purchase, or whether they made anything more than a few models. It should also be understood that all of the above figures are only approximate, and are the best we can get from incomplete records."

A vast amount of testimony has been taken in this case. Counsel having disagreed as to the tenor, scope, and effect of this testimony, it has been necessary for us to read over 2,000 printed pages of the record in this case. The testimony offered by the prosecution covered the period from 1882 to June, 1912. Much of this testimony was objected to by respondent as immaterial and in no way affecting the present corporation. It has been urged by counsel for the respondent that the court should not consider the testimony relating to the business transactions of respondent prior to its being admitted to do business in this State, and it has been even urged by respondent that the court should not consider the testimony relating to the manner of conducting respondent's business prior to the filing of the information in this case. We shall speak of this subject later.

It is the contention of the prosecution that, under the circumstances as disclosed in this case, it is competent for the court to consider the manner of doing business by the respondent, not only since 1906, when it became an Ohio corporation, but also for the prior years, because the corporation has substantially been the same, although organized under the statutes of different States, and that the business has been from the first dominated and controlled by John H. Patterson, who has been the president and controlling spirit during all of the intervening years. It is the conten-

tion of the prosecution that in order to ascertain the intent of the respondent to create and maintain a monopoly it was not only competent, but necessary, to trace its course and manner of doing business during all the years covered by the testimony in the case, at least for the purpose of considering whether there has been any change in the manner of doing business on the part of the respondent from its early organization down to the time of the taking of the testimony in this case.   It is the claim of the prosecution that it has been the fixed policy of the respondent, during all these years, to drive out and destroy all competition and to create a monopoly in the business; that notwithstanding the conflict in the testimony, on many points, there is a clear preponderance of evidence to the effect that the statute has been violated.   Much of the evidence consists of letters and publications of respondent, its officers and agents.   In our opinion the burden of proof resting upon the prosecution has been sustained, and it has been shown that the respondent was organized for the purpose and with the intent to establish and maintain a monopoly in the business in which it has been engaged.   A monopoly has been variously defined.   As applied to the case in hand, the following definitions appear to be appropriate:

"A monopoly, in the modern sense, is created when, as a result of efforts to that end, previously competing businesses are so concentrated in the hands of a single person or corporation, or a few persons or corporations acting together, that they have power to practically control the prices of commodities and thus to practically suppress competition."   *United States* v. *Tobacco Co.* (C. C.), 164 Fed. 700-721, and cases there cited.

"A monopoly exists where all or so nearly all of an article of trade or commerce within a community or district is brought within the hands of one man or set of men, as to practically bring the handling or produc-

tion of the commodity or thing within such single control, to the exclusion of competition or free traffic therein." Cooke on Combinations, Monopolies and Labor Unions (2d Ed.), § 116, and cases there cited.

See, also, Joyce on Monopolies, § 8, citing *Davenport v. Kleinschmidt*, 6 Mont. 502 (13 Pac. 249), and other cases.

The purpose and intent of the organization may be shown by its acts and the policy pursued after organization. It is not necessary, in order to bring the respondent within the operation of the statute, to show that its organizers expressly bound themselves, each with the other, to establish and maintain a monopoly of the business of manufacturing, buying, selling, and dealing in cash registers. It is sufficient if it is shown that they acted together in pursuance of a common object, and, while this presupposes agreement between them in a broad sense, an agreement or contract in a technical sense need not be shown.

In *International Harvester Co.* v. *Commonwealth*, 144 Ky. 403 (138 S. W. 248), it was said:

"It is not necessary, to sustain a conviction in cases like this, that there should be positive evidence that a combination or conspiracy was formed, and that the purpose of it was to fix, regulate, and control prices. A rule of evidence like this would, in almost every case, operate to defeat the execution of the law, as it would be difficult, if not impossible, in many cases to introduce witnesses who could testify of their own knowledge that such a combination was formed, and that its purpose was to fix or control prices. * * * There are many cases in which the intention to violate the law is a necessary ingredient in the offense, but the Commonwealth is not required to show by direct evidence the existence of this intent. A rule of evidence like this would defeat, in a majority of cases, the ends of justice, as it is not often that persons who contemplate violating the law make known in advance their purpose in such a way as that it can be proven against them. And so, to meet conditions

like this, the law presumes that persons of account-able years intended to do that which they did do, and will infer from the act that the intention to commit it existed."

It is urged by counsel for the respondent that it was immaterial and irrelevant to show the conduct and course of business of respondent prior to the time of the filing of the information in the case. The pleadings on behalf of the people set forth in detail the organization of prior and successive corporations in Ohio and in New Jersey for the purpose of conducting the business and property to which the respondent has, in its turn, succeeded. They also charge these former corporations with being parties to the original conspiracy which, it is claimed, has been maintained through all the life of each of said corporations, and is still being maintained by the respondent. The charge is, and the evidence tends to support it, that the respondent is composed of the same stockholders, having the same officers and agents as each of the former corporations, and that it is in fact identical in body and mind with each of the original corporations, and that this identity has been maintained at all times since the original combination or conspiracy, as charged, was formed. It is true that each corporation is a separate legal entity, but, as stated by the supreme court of Ohio in *State* v. *Standard Oil Co.*, 49 Ohio St. 137 (30 N. E. 279, 15 L. R. A. 145, 34 Am. St. Rep. 541), this—

"Legal entity, apart from the natural persons who compose it, is a mere fiction, introduced for convenience in the transaction of its business, and of those who do business with it; but  *  *  *  when urged to an intent and purpose not within its reason and policy, may be disregarded."

It would be without reason to say that certain individuals could organize themselves into a body politic and corporate, which fictitious entity might

become a party to a conspiracy to violate the law in the creation of a trust or monopoly in the destruction of competition; that when it had contributed by its efforts and its capital largely to this end, these same individuals might abandon that corporation, lest they and it be punished for the wrong, and its charter revoked, organize a new and independent corporation to take its place in the conspiracy, so that the business might go on uninterrupted and unchallenged by the State, and this new corporation, or new conspirator, joining the conspirators in the furtherance of the common design, and accepting all the property, benefits, and advantages already acquired for it by the united efforts of the former corporation and its conspirators, yet be exempt because it had no part in the original conspiracy.

It was held in *Cooke* v. *People*, 231 Ill. 9 (82 N. E. 863), that:

"Every person who enters a conspiracy already formed is deemed, in law, a party to all acts done by any of the other parties, before or afterwards, in furtherance of the common design; and the entry of such persons into a conspiracy already formed does not make a new and distinct conspiracy."

While in the instant case, in order to prevail, the people must show that the respondent has, since July 11, 1906 (the time when it was admitted to do business in this State), been organized for the purpose and with the intent of establishing and maintaining, or of attempting to establish and maintain, a monopoly, yet we think it is competent to show the acts done or committed by its predecessors in the claimed conspiracy, for the purpose of characterizing and explaining its conduct since its coming into this State. It is true that respondent is not to be punished for the acts and wrongs of others, unless it has become a party to the wrongs complained of, and has taken its place in the conspiracy charged, and has been do-

ing and performing the things charged against it. We are of opinion that it is our duty to examine the evidence offered for the purpose stated. See *State of Ohio* v. *National Cash Register Co.,* 13 Ohio Cir. Ct. R. 73.

It is also urged by counsel for respondent that certain specific conduct of its officers and agents should not be held as binding on the corporation, and much of the evidence is objected to on this ground. It is worthy of note, in this connection, that the man who, for many years, has been president of respondent and its predecessors, was not called as a witness on behalf of respondent, although the evidence is overwhelming that such officer has dictated and controlled the policy of the same since 1886. It is a familiar rule that the acts of officers and agents of a corporation, within the scope of their employment, are the acts of the corporation, and are evidence against it. In fact corporations can only act through officers and agents.

As was said by the supreme court of Missouri in *State* v. *Packing Co.,* 173 Mo. 356 (73 S. W. 645, 61 L. R. A. 464, 96 Am. St. Rep. 515), in speaking of statements and acts of salesmen and agents of the corporation:

"They were, therefore, statements made by these persons who were employed by the respondents, and who transacted all the respondents' business of selling in this State, were made while so engaged, and related to the business being transacted. They were, therefore, statements of agents touching the business of the principal then being transacted by such agents, and such agents were the only representatives of the respondents that the buying public ever saw or dealt with. They quoted the prices to the public. * * * They delivered the goods and collected the bills. They were, therefore, statements made by the authorized representatives of the respondents, while in the transaction of their business and touching the business. They were, therefore, admissible in evidence and were just as binding upon the respondents as if those state-

ments had been made by the highest officer of the company, or had been solemnly adopted by the directors or stockholders of the company and entered on the minutes of their meeting" (citing many cases).

Until about the year 1908 the respondent issued a publication known as the "N. C. R." The testimony is undisputed that this publication was not only authorized, but was under the direct management and control of the corporation, and especially its president. In this publication, under date of May 22, 1890, the following appears:

"We propose hereafter to set aside, say, $5 on each register made, for knockout expense fund to be devoted to maintain a monopoly. It will amount to about $200 per day."

Under date of April 30, 1890, an article appeared entitled:

"To Our Agents. Reasons why monopolists can pay good salaries and hire the best men.

"We have been called monopolizers of the cash register business. If by monopolists they mean that we are the only manufacturers of cash registers, and that we do not intend to permit any company to be established and reap a harvest where we have sown, then we are monopolists and will uphold the title. By fighting opposition and forcing them down by legal right we can maintain prices that are consistent with the finest class of workmanship. *   *   *

"The monopolists can give these guaranties. There is but one Standard Oil Company; there is but one Armour; but one Pennsylvania Railroad; but one Western Union Telegraph Company. These corporations control the market, yet do not do it at the expense of the consumer. Their prices are like ours, consistent with the class of goods and service they give. That monopolists are the very best possible concerns to be associated with is a fact beyond dispute. *   *   *

"That we mean to be the only manufacturers in our business we have shown by our legal fights for

our rights.  We have the patents and the organization—the U. S. laws will do the rest."

It is in evidence that one of the president's expressions at the conventions was:

"The proper way to kill a dog is not to start at his tail, but cut his head off.  You could not kill a tree by picking the leaves off, the proper way is to chop it down."

In the publication of February 2, 1891, appeared the following article, signed "J. H. P." which meant John H. Patterson, president of the respondent company:

"Prices of the registers must be kept up by knocking competitors down.  Hereafter my whole time will be devoted to this business exclusively.  I have arranged shelves in my office to hold samples of all models which were upstairs in our model room, also models of our new registers and knockers.  These models have all been put in working order and make such a formidable array as to discourage any company from embarking in the business.

"We invite all capitalists who are thinking seriously of embarking in the cash register business to come to our factory, and they will be shown through our plant from cellar to garret.  We will endeavor to convince them that it will not pay them to go into the business, in the same way that we lately convinced a committee of the New Brunswick Board of Trade, whom we showed our No. 9 was a better machine for bars than the Standard.  We placed the two side by side.  We showed that we could take off several of the advantages of our No. 9, make it operate with two or three motions, and it would still be better than the Standard, and we could afford to sell it for less money than the Standard, and would do so.  We showed them that our detail No. 3 and No. 4 and our total adding store, No. 10, were all better than the Standard for store use; that we could take off certain automatic arrangements and do the same work with three or four motions, thus making knockers out of them, and that we could afford to sell them for much less than the

Standard asked for their register, and would do so. This showing completely nonplussed them. One of the committee, Mr. Johnson, is worth over two millions, and has a factory as large as ours."

Under date of January 31, 1891, appeared the following:

"We send greetings and pledge ourselves to fight the opposition to the death wherever it appears in this territory."

Signed by John T. Watson and eight other agents whose headquarters appeared to be in Baltimore or Washington.

Under date of April 1, 1890, in said publication appeared the following article headed "We Ask No Quarter," and it was also headed with a black flag with a white cross in the center. It is as follows:

"In this fight against competition for our bread and butter we will never ask for or give any quarter. It is a fight to the death. We make it a personal matter, and would feel more like speaking to a man who had knocked us down than we would to some of the parties who are endeavoring to injure us. Therefore we make the fight against competition a personal affair. We wish our agents would do the same. We think self-respect demands it. We would not speak to an agent of competitors.

"We ask you not to recognize as gentlemen in any way the agents of opposition companies. They, we believe, are illegally trying to get our property away from us. Our patents and our system are as much our property as a farmer's sheaf of wheat. Before we will give it up we will be whipped. We ask you to make all competition fierce and bitter, as much so as if you were getting hit in the face with a fist."

Under date of October 4, 1890, appeared the following entitled:

"TO THE AGENTS.

"We have opened a fight against the Lamson Co. Keep us posted on all matters regarding Lamson's

agents and their movements. We are getting out some special advertising matter for this war. If you need any of it in your territory, let us know and we will send you some.

"The most valuable weapon for this fight at present are testimonials from parties who have used the Lamson machine, replacing them with Nationals, setting forth the superiority of the National over the Lamson. If you know of any parties who have made such exchanges go at once and get good, strong testimonials from them. Mail them to us. This is to be a hard fight, and if I have your hearty co-operation I feel sure it will be a short fight." Signed by Jos. H. Crane.

Joseph H. Crane, the evidence shows, was a sales agent.

The following letter, signed by J. A. Nelson, who was a sales agent at the agency of Harry Blood, the Chicago agent of the respondent, is headed:

"A LAMSON KNOCK OUT.

"CHICAGO, ILL., Aug. 27, 1890.

"The National Cash Register Co.

"On my return I found Mr. Shaw representing the Lamson Cash Register Company. He is located at No. 85 Dearborn street, in the same office occupied by the Lamson Carrier System. They have samples of all their machines. I heard Monday afternoon that they had sold a machine on Clark street. I found the place and had a long talk with the purchaser. We went over the register in detail, and he then handed me the Lamson circular, with flaming red letters reading 'Solid Shot,' which doubtless you have seen. I knocked out this register and had the pleasure of sending it back to the Lamson office. I then called on Mr. Shaw to see how things looked. I informed him of what I had done, and he turned whiter than a sheet. To have the first machine he had put out in Chicago knocked out took the wind out if his sails somewhat. We will do the best we can until Mr. Blood's return when we will try to knock out every machine they put in. When I left the office my last remark to Mr. Shaw was, 'Ben, if you want $5.00 you

can get it from me; but if you ever try to sell a register in Chicago I will pester you.'

"Yours truly,

"J. A. NELSON."

Under date of March 1, 1895, appears the following under the title "Then And Now."

"On June 24, 1892, the Boston Company issued a circular a portion of which we quote:

"'You may expect to be bulldozed by the representative of the National Cash Register Company, of Dayton, Ohio, in your city, who will call upon you and recite his catechism something as follows: "That the National Cash Register Company created the cash register business and practically owns it; that no one else has any rights; that they do not intend to let any other company live; that he, the agent, does not want to do any dirty business behind your back, and therefore comes to you to tell you that he proposes to knock out every register that you may place, and close up your business. No matter how much money you have to invest, it will make no difference; and much more in the same strain." This has been repeated substantially to all our representatives from Maine to the Pacific Ocean.'

"That's right. We did say it, and our claims have turned out to be true in every respect. How much better it would have been for them if they had paid attention to our agent's catechism."

Under date of May 1, 1892, appeared in said publication the following:

"The more opposition registers put on the market, the more we will knock out. Whenever I hear of a new machine, it don't scare me, because I know that we are able to duplicate it, to put a knocker on it— a better register at a less price, and in that way to discourage and kill it." Signed by F. J. Patterson, who was at that time vice president of the respondent.

Also the following, signed by J. H. Crane, managing director and sales agent:

"In knocking out an opposition register by the use of a 'knocker' it is desirable to accomplish one of three results. The first and best thing to do, of course, is to knock it out before it gets into use. The next is

to disgust the purchaser in order that he will send it back to the manufacturer and buy one of our regular registers, or to so disgust him with the opposition register, that he will send it back to the maker and not buy anything. As a last resort, knock out his opposition register and sell him a knocker. The last is the least desirable victory to be achieved, but we would rather have you do that than not to knock out the opposition register at all."

Also the following in the same publication:

"I presume that there are about fourteen or fifteen different styles of registers in an embryo state, waiting to come upon the market. When they appear we will jump onto them and knock them out.
                    "JOHN H. PATTERSON."

In the same publication appeared the following:

"One opposition company said lately that if we whipped out the Bensinger Company we could whip out any company that might oppose us. There was, therefore, no hope for their company, because if we did not buy out Bensinger, we would not buy out any concern. We are reliably informed that Bensinger lost $67,000 in this business.

"It is only a question of whether we propose to spend the money to keep down opposition. If we continue, it is absolutely certain that no opposition company can stand against this company and its agents. If necessary, we will spend five times as much money as we have already done, in order to down opposition. If they really believe this 'they will throw up the sponge and quit.' We are receiving overtures to buy out opposition. We will not buy them out. We do not buy out; we knock out.

"General Butler said to us, four years ago, that we had an unusually fine prospect. 'The only way to make money out of it,' said he, 'is to fight. If you get whipped in one court, carry it to a higher court, and if you get whipped finally in the Superior Court, commence all over again in a new case and fight. Never compromise and never buy out. It is more expensive, probably for a year or two, to fight, but as soon as the opposition know that you will fight at

every point, regardless of the money it takes, they will let you alone.'

"General Butler was prominent in war, politics, business and law. We have taken his advice, and propose standing by it, if it takes every dollar we have."

Under date of May 15, 1892, appeared the following in said publication:

"Opposition Companies.

"Since The National Cash Register Company started in business, it has had sixty-three opposition companies with which to contend. While most of these companies are now out of business, they were at one time actively engaged; and the competition with them was exceedingly fierce. The victory was won only by hard fighting and the display of an unlimited amount of skill in attacking these companies. Many of them were wealthy corporations, while others struggled along hoping to sell their registers on their merits. It is estimated that over $3,000,000 have been lost by these opposition companies, and, while a few of them are yet in existence, none of them are making money."

In their display window in the agency of respondent in Detroit there were displayed quite a number of Hallwood machines with a placard on some "We sell these registers at thirty cents on the dollar." Sometimes this display would be made up of Hallwood machines, and sometimes respondent's machines would be exhibited alongside of the Hallwood registers.

It appeared in evidence that at the convention of its agents and managers, held at Dayton, Ohio, at the factory of respondent, on July 22, 1907, the following language of the president appeared as a part of the proceedings:

"What this factory is today is not due to any one man, but it is due to all of us. I want to tell you what a satisfaction and pleasure it is to me now to have conceived ten years ago what this factory would be if we kept down competition, and to realize now

how near we are to being a model factory.  *  *  *
We want Mr. Anderson of the competition department
to give you a little idea of how we are going to con-
trol competition.  We want Mr. Hayward also to give
you a little talk.  We want Mr. Muzzy to tell you how
we are going to absolutely control the competition of
the world because we want you to feel this way.  The
first thing that we aim to do is to keep down com-
petition.  We are getting things here at the factory
in good shape.  Practically all of my time has been
given to competition, more largely on the other side
where we have been threatened by brains and millions
of dollars; I was over there last year and had very
good success in meeting this competition.  *  *  *
Now with competition practically out of the way—
with no labor unionisms, no more power here in this
factory—(we have gotten rid of the worst of it) now
we have time and willingness and desire to help the
selling force.  *  *  *  We have been through the
recording force and are now ready to assist the sell-
ing force, not particularly in competition; but we must
keep that down.  We want to assist you in fighting
the ignorance of the probable purchaser.  That is
what we have to fight now."

It is not surprising that these teachings brought
about the results testified to.  Much more testimony
of extravagant statements made by the president and
other officers and agents of the respondent might be
given here, but it would extend this opinion to un-
reasonable length.

There was evidence of employment, especially at
Columbus, Ohio, by the respondent, of a person whose
duty it was to watch the shipments of the Hallwood
Company, a competing manufacturer, and report same
to the respondent.  There was also evidence that the
respondent carried upon its pay roll one Ellingwood,
who was acting as bookkeeper for the Foss Novelty
Company, a competing company, and that this em-
ployee furnished inside information to the respond-
ent with reference to the business of said rival com-
pany.  The use of the knockout card, so-called, was

testified to by one of the respondent's witnesses, and it appeared that the agent got credit for a "knock out" whether he sold one of respondent's machines or not. This knockout card, known also as the "red card," contained the following:

*Q.* * * * "The red card should be filled out for every opposition register knocked out, whether a National replaces it or not."

The witness answered:

"That explains it.

"*Q.* Then it is your recollection that the agent got credit for a knock out whether he succeeded in selling a National or not?

"*A.* Yes, that is all explained in the exhibit there.

"*Q.* You said in your direct examination that that system, in some form or other, was kept up to the time you left?

"*A.* Well, I said that the system of reporting work in the field was kept up to the time I left; later, on cards by daily reports. * * *

"*Q.* If you knocked out the sale of a competition register and did not succeed in selling a National in its place, the agent did not get anything?

"*A.* Yes, I think he got this bonus, because he had spent a great deal of time on that work."

Respondent's witness Cherry testified, on cross-examination, to the manner in which the selling agents in competing companies were followed while about their work. This man was still in the employment of the respondent at the time he testified. When asked how he found out where the agents of competing companies were going, he testified that he had friends and acquaintances in his territory that were interested in him and his business, and they would tell him of cash register men being in certain localities on their trips.

"*Q.* How did you find out they were going there?

"*A.* In the same manner.

"*Q*. Your friends in that locality would find out that they were going there and let you know?

"*A*. In a few cases, yes.

"*Q*. When you found that they were going you sent your men on ahead?

"*A*. Not necessarily ahead; I sent them out as soon as I could conveniently arrange for them to go there.

"*Q*. It always happened it was convenient for you to send them the same day that they were going?

"*A*. No.

"*Q*. Very frequently happened?

"*A*. It happened occasionally, yes.

"*Q*. Isn't it true you tried to make it happen that way whenever you knew they were going?

"*A*. If conditions warranted, yes.   *   *   *

"*Q*. Whenever you knew about it and you knew they were going you made it a point to have your men go there too?

"*A*. Yes, sir.

"*Q*. As a matter of fact that was your policy during all of the time they were in business?

"*A*. Yes, sir.

"*Q*. And that is the policy of the National Cash Register Company, isn't it?

"*A*. I don't know.

Speaking of unfair competition, Nims on Unfair Business Competition, § 9, says:

"All this law of unfair competition might seem to have the effect of limiting the rights enjoyed by all men to trade freely with each other. But the restrictions imposed by it are not imposed upon traders alone, but equally on all other citizens. The right to trade is not an absolute right, but a qualified one. Whether a man be a trader or not he is not justified in damaging another's business or profession by fraudulent methods, by threats, interference with contract, libel or slander of goods, obstruction or unfair methods of any sort. It is the policy of the law to encourage fair trade in every way."

In the case of *Angle* v. *Railway Co.*, 151 U. S. 1 (14 Sup. Ct. 240), that court said: An actionable wrong is committed by one who—

"Maliciously interferes in a contract between two parties, and induces one of them to break that contract to the injury of the other, the party injured can maintain an action against the wrongdoer."

The doctrine is summarized by Nims at section 182:

"From the foregoing, it will be seen that one who interferes in a transaction between other persons who are about to enter into, or are already under contract obligation to each other, may often, not always, be held for damages or enjoined. The cases mentioned above do not include the class of cases most closely related to unfair competition as the term is usually understood. They have been discussed because they serve to illustrate various applications of this principle which is now under such frequent discussion."

The doctrine seems to be that there are at least two ways of interfering with contracts made by other persons: (*a*) By preventing a contract being made; (*b*) by causing the parties to break it after it is made.

Mr. Bigelow claims that to make a *prima facie* cause of action for procuring one person not to contract with another, three things must be shown: (1) Notice to the defendant of the plaintiff's relation to the third person; (2) interference with that relation; (3) damage.

In *Temperton* v. *Russell* (1893), 1 Q. B. 715-728, it was urged that a distinction exists between inducing a breach of the contract already entered into and inducing persons not to enter into contracts, but the court refused to sustain it, saying that the same wrongful intent existed in both cases and the same sort of injury to the plaintiff.

*Gregory* v. *Duke of Brunswick*, 6 M. & G. 953, was cited as sustaining the rule that acts which prevent contracts being made are actionable. Many cases might be cited as pertinent to this question, among them *Beekman* v. *Marsters*, 195 Mass. 205 (80 N. E. 817, 11 L. R. A. [N. S.] 201, 122 Am. St. Rep. 232, 11 Am. & Eng. Ann. Cas. 332).

There are many ways, other than by interference with contract, of harassing, interferring with, and obstructing a competitor in such a manner as to amount to unfair competition, in the broadest sense of the term.   The business of another may be unlawfully obtained by harassing his customers and salesmen, just as effectively as by passing off his goods as those of another.   *Sperry & Hutchinson Co.* v. *Weber & Co.* (C. C.), 161 Fed. 219.

The authorities speak especially of interference with salesmen of a competitor.   *Evenson* v. *Spaulding,* 150 Fed. 517, 82 C. C. A. 263 (9 L. R. A. [N. S.] 904). Spaulding manufactured buggies and wagons in Iowa and sold them, through itinerant salesmen, to farmers and others in the State of Washington.   A voluntary association, composed principally of dealers in hardware and farming implements in the State of Washington, existed, the object of which was to induce farmers and others to limit their trade to dealers within the State.   This association employed agents to follow closely Spaulding's salesmen, to interrupt their conversations with farmers, and dissuade the latter, by false statements and otherwise, from buying Spaulding's goods, and in various ways to intimidate and interfere with the salesmen.   The agents of the association very rarely offered any buggies or wagons for sale, and hardly any of the members of the association dealt in buggies.   This was held an unwarranted attempt to destroy complainant's business, and an injunction *pendente lite* was granted.

An injunction was issued against the Standard Oil Company, in 1904, because of very similar conduct on its part.   *Standard Oil Co.* v. *Doyle,* 118 Ky. 662 (82 S. W. 271, 111 Am. St. Rep. 331).   Its agents attempted to ruin the business of one Doyle by making false representations to his customers, and by threats and intimidations.   It also harassed his employees by

following and interfering with them, and offering his customers oil at a lower rate, or for nothing.

There may be also interference by bringing a multiplicity of suits. The bringing of a multiplicity of suits, started not in good faith, but for the purpose of deterring the public from purchasing from a rival and ruining his trade, was enjoined in Wisconsin. Where a large number of infringement suits were brought, the prosecution of them was restrained until the questions involved had been determined in the principal suit, the object of the multiplicity of suits being found to be to harass a rival manufacturer and destroy his business. Quarles, D. J., said:

"Instances are not wanting where patentees make illicit use of the courts as instrumentalities of oppression; bring a multiplicity of suits, purposely scattered through the circuits, not for the honest purpose of securing an adjudication in support of the patent, but to crush a rival manufacturer by creating a stampede among his customers; alarming them by circulars breathing threats of prosecution, denouncing the product of the rival concern as an infringing device, at the same time taking no step to bring any of the numerous suits to final hearing." *Commercial Acetylene Co.* v. *Lighting Co.* (C. C.), 152 Fed. 642.

There is no question that it is lawful and proper for the owner of a patent to give a notice of infringement of his patent to any infringer thereof, or to any user of an infringing article. It is also his legal right to bring and prosecute a proper suit to restrain an infringer or user, and he may bring and prosecute a suit for recovery of damages against an infringer or user. Such suit, however, must be honestly brought and prosecuted in good faith, and not commenced and prosecuted to harass, annoy, intimidate, financially embarrass, and drive out of business a competitor, for such acts and conduct would amount to unlawful and unfair competition. In most instances, where suits were brought, as shown in this record, they were not

prosecuted to judgment, and in many instances, under the testimony, we are satisfied that suits were brought for the purpose of intimidating, harassing, and financially embarrassing competitors for the purpose of driving them out of business. Respondent's foundation patents had already expired when suits were brought, in many instances.

The evidence above quoted and referred to shows the policy, intent, and purpose of the respondent; and, while it probably is true, as claimed by respondent, that some of the unlawful and objectionable means resorted to by respondent and its predecessor, at an early day, have of late been modified or discontinued, we are not satisfied that its policy has been changed, but that the occasion for the use of such means no longer exists, for the reason that most of the competition has been, by respondent, driven from the field. As showing recent conduct and practices of respondent, we refer to the testimony of Carl S. Heyne, Chas. G. McDonough, Henry F. James, Wm. R. James, Wm. H. Webster, and the cross-examination of Richard B. Cherry and John F. Le Brou. It is objected that much of this testimony consisted of generalities and hearsay. Eliminating such testimony, much remains of specific acts and conduct which is not met or overcome, in our opinion, by respondent.

It is also urged that competitors have resorted to like extreme measures. While this may have been the occasion of respondent's conduct, it is no justification of it. We are here dealing with respondent. As tending to show that its present competitive conditions are unobjectionable, respondent offered in evidence a letter of the vice president and manager, which reads as follows:

"NEW YORK, April 1st, 1909.
"TO ALL DISTRICT MANAGERS:
· "Mr. C. A. Snyder:
"In the various conventions I have attended I find

that some of the newer members in the districts are not thoroughly clear on the best way to handle sales made by other companies. Please see that every agent in your district thoroughly understands our position in the matter.

"You know what this policy is, but in brief will say that in no case will we permit any of our agents to misrepresent cash registers manufactured by other companies, neither will we permit any agent or person in our employ to induce any purchaser of a cash register made by any other company, to break his contract and return his register to the manufacturer. With the line of registers that our agents now have, they are able to show superiority of Nationals over those of any other make, and at lower prices.

"There has been no violation of our policies that I know of, but I give you this information because of the inquiries received from the newer men in the field.

"Please see that these instructions are carried out in every detail, and that the new men are so instructed on entering the field.

"Yours truly,
"WM. PFLUM,
"Vice President and Manager."

Without intending to intimate that this letter was not written in good faith, it is significant that at that late day it became necessary to write such a letter at all. The writer of the letter was not called to testify as to the occasion of it, and the evidence is not clear as to the extent of its promulgation. There was much evidence of subsequent conduct of salesmen along the old lines of objectionable practice, but not to the same degree, as at an earlier date.

The conclusion is irresistible that the respondent is guilty of a violation of section 4 of the act of 1905, above set forth. The motion to set aside the order granting leave to file the information is denied.

This leaves only the question of punishment. The punishment to be imposed, in our opinion, under the statute, rests in the sound discretion of the court as between an ouster and a fine. It need not be neces-

sarily a general judgment of ouster, as is contended for by counsel for the prosecution. It may be an ouster of the right to do the particular act complained of, *i. e.*, the purpose and intent of establishing and maintaining a monopoly. It will be noted that the articles of incorporation of respondent do not disclose any purpose or intention of doing an unlawful business. A lawful business might and may be carried on under such articles. This information was filed under our general statute (chapter 275, 3 Comp. Laws), relating to informations in the nature of quo warranto, in which chapter is found section 9961, 3 Comp. Laws (5 How. Stat. [2d Ed.] § 14076), which reads as follows:

"Whenever it shall be found or adjudged that any corporation against which an information in the nature of a quo warranto shall have been filed, has, by any misuser, nonuser or surrender, forfeited its corporate rights, privileges and franchises, judgment shall be rendered that such corporation be ousted and altogether excluded from such corporate rights, privileges and franchises, and that the said corporation be dissolved; or, in lieu of such judgment (except in case of such surrender), the court may impose a fine not exceeding ten thousand dollars upon said corporation; but such fine shall not prevent further prosecution for any continuance or repetition of the conduct complained of, to be had on like leave of the court first had and obtained."

The judgment might be a suspension judgment of ouster with a fine; or it might be a simple fine. In short, the judgment rests in the sound discretion of the court, as above indicated. See *State* v. *Packing Co., supra*, 173 Mo. at pages 392-393 (73 S. W. 645, 61 L. R. A. 464, 96 Am. St. Rep. 515), and numerous cases there cited. 5 Thompson on Corporations (2d Ed.), § 5824. 32 Cyc. p. 1464.

Under the circumstances, it appearing that respondent's articles of association authorize and provide for

a lawful business, and that it has offended by acts of misuser; and, it also appearing that between 17,000 and 18,000 machines of respondent's manufacture are in use in this State by between 13,000 and 14,000 individual purchasers, which users and purchasers might be greatly injured in their ability to obtain repairs and new parts to keep up machines, in case of a judgment of absolute ouster, in our opinion a judgment of absolute ouster is not necessary, but that the ends of justice will be satisfied by the imposition of a substantial fine, and the payment of the costs in the case. It is accordingly ordered that the respondent pay to the clerk of this court within 60 days from this date, the sum of $10,000 as a fine, and also the costs in this case to be taxed. In case the respondent fails to pay said fine and costs within said time, it is ordered that said respondent be ousted of all rights, privileges, and franchises of every nature and kind conferred upon it by the laws of this State, and be forever prohibited from doing business in this State; and any permission or authority heretofore obtained by said respondent to do business in this State is, in the event of default or failure of such payment, declared to be illegal and void. A judgment will be entered accordingly.

MCALVAY, C. J., and BROOKE, OSTRANDER, MOORE, and STEERE, JJ., concurred. KUHN and BIRD, JJ., did not sit.